COLUMBIA NATIONAL BANK OF LINCOLN, APPELLEE AND PLAINTIFF IN ERROR, V. FRED W. BALDWIN ET AL., APPELLANTS AND DEFENDANTS IN ERROR.

FILED MAY 21, 1902. No. 11,425.

Commissioner's opinion, Department No. 1.

1. **Deed: FRAUDULENT: ASSAULT BY THIRD PARTIES.** Where a deed is assailed by third parties as fraudulent, and proof by them is introduced to impeach the recited consideration, the grantee may show by parol evidence the actual consideration, though different from the one recited in the deed.

2. **Parol Trust.** A parol trust, if clearly established, is a sufficient consideration to support an executed deed against the grantor's creditors.

3. ———. "Parol evidence to establish a * * * trust must be clear, unequivocal and convincing." *Doane v. Dunham*, 64 Nebr., 135.

4. **Creditors' Bill: PRAYER: GENERAL RELIEF.** Under a prayer for general relief in a creditors' bill, a sale of property not attached may be decreed, where the facts entitling a party to such sale are alleged and proved, although the petition asks specifically only for a sale of attached property.

5. **Evidence.** Evidence held to support a referee's finding that conveyances complained of were fraudulent and void as to creditors.

APPEAL by defendants and proceeding in error by plaintiff. Tried below before FROST, J., in the district court for Lancaster county. *Modified.*

*Charles O. Whedon* and *Charles E. Magoon,* for appellants and defendants in error.

*E. E. Brown, Frank H. Woods* and *R. D. Stearns, contra.*

HASTINGS, C.

A very extensive record is presented in this creditors' bill case. The particular matters in dispute are whether lot 12 in block 62 in Lincoln, Nebraska, was conveyed to Mattson H. Baldwin by his parents in discharge of a parol trust imposed by their grantor, A. J. Mattson; what was the actual consideration for certain real estate in Prophetstown, Illinois, also conveyed to him in 1894 by his parents; what was the real consideration for conveyances by the same parties of real and personal property in 1895 and 1896 for a nominal consideration of about $70,000; the value of the several items of property transferred to the son by his father and mother, and the good faith of the indebtedness claimed as the consideration of the transfers.

One important contention is as to whether or not the consideration named in a conveyance is conclusive upon the parties when that conveyance is attacked for fraud.

The finding of the referee that lot 12 in block 62 in Lincoln, was conveyed to the parents, the Baldwins, not in trust for their son, but in fee simple, is earnestly assailed both as to the facts and as to the legal conclusions found by the referee.

By agreement of parties, Hon. J. R. Webster was appointed as referee to find both the facts and the law of this case. His findings, after the merely formal ones as to the location and incorporation of plaintiff; its recovery of a small judgment against Fred W. Baldwin in July, 1896; the filing of a transcript thereof, execution thereon and proceedings in aid of execution; and the recovery in December, 1896, of a judgment against both Fred W. Baldwin and Ida M. Baldwin for $7,931.24 and costs on a note dated April 17, 1896, due May 27, 1896, the last renewal of a series of notes beginning November 26, 1894, by which notes Ida M. Baldwin pledged her separate estate, and whose consideration was a previously existing debt of Fred W. Baldwin,—continue:

"At the time said indebtedness accrued and the first of said series of notes was made by said Fred W. Baldwin and Ida M. Baldwin, and prior and subsequent thereto, until about March 10, 1896, said Ida M. Baldwin and Fred W. Baldwin were each owners of a large amount of real and personal property of aggregate value of about $100,000.

"(a.) Ida M. Baldwin was owner in her separate right of lot 22 in Wallingford & Shamp's subdivision, and lots 1 and 2 in block 9 of C. C. Burr's subdivision, all in Lancaster county; also of a mortgage foreclosure judgment in this court in suit of Ida M. Baldwin versus Caroline Purdue against lot 2 in Wallingford & Shamp's subdivision, recovered on a mortgage payable to said Ida M. Baldwin. Said real properties, by deeds bearing dates and reciting considerations, respectively, June 15, 1895, $1,200, June 20, 1895, $3,500, said Ida M. Baldwin and husband conveyed to defendant Mattson H. Baldwin; and said foreclosure judgment and her bid made on sheriff's sale of the

mortgaged premises, she assigned to said Mattson H. Baldwin, whereby, after confirmation of sale, he obtained a sheriff's deed conveying him title to said Purdue lot, 2 in Wallingford & Shamp's subdivision.

"(*b.*) Said Fred W. Baldwin was owner of lot 4 in block 5 of Houtz & Baldwin's subdivision, lots 1 and 2, block 4, Capital addition, lots 11 and 12, block 99, of Lincoln, and lots 1 and 22 of Fairbrother's subdivision; and said real estate, by deeds bearing date and reciting considerations, viz., June 20th, $500; June 20th, $3,000; June 20th, $——; September 18th, $2,500,—executed by himself and his wife, Ida M. Baldwin, was conveyed to Mattson H. Baldwin. Said Fred W. Baldwin was also owner of the north half of north half of section 10, and the southwest quarter of section 3, township 11 north, range 5 east, called the 'North Farm,' mortgaged for $4,000, and the south half of northeast quarter of section 23 in township 9 north, range 6 east, known as 'Meadow Brook' or 'South Farm,' mortgaged for $3,000, and by deed bearing date March 18, 1895, for a consideration expressed at $10,000, conveyed the 'North Farm,' and by deed dated September 18th, for a consideration expressed at $6,000 (both deeds being acknowledged September 18, 1895) conveyed the 'South Farm,' to Mattson H. Baldwin; the mortgages being accounted as part of the consideration. All the stock and chattels of the 'South Farm' Fred W. Baldwin, by bill of sale dated June 20, 1895, for a consideration expressed of $6,000, and all the chattels and stock on the 'North Farm,' by bill of sale dated February 18, 1896, for a consideration expressed of $1,500, and all his office furniture, safe, family carriages, and horses and trappings, by bill of sale of date February 1, 1896, for a consideration expressed of $500, conveyed and set over to defendant Mattson H. Baldwin.

"(*c.*) Said Fred W. Baldwin and Ida M. Baldwin, by deed conveying to them jointly, were owners of lot 12 in block 62 in the city of Lincoln, and by deed bearing date September 10, 1895, reciting a consideration of $8,000, conveyed the same to said Mattson H. Baldwin."

The referee then finds that a part of the deeds were recorded March 10, 1896, and the rest later; that there was no possession nor ownership exercised by the grantee till February or March, 1896, and to that time the parents remained in possession; that by deed dated December 2, 1894, the parents conveyed to the son, for an expressed consideration of $5,000, real estate in Prophetstown, Illinois, which deed was recorded September 1, 1895. The referee also found that from September, 1894, to November, 1896, there were sixteen suits commenced in justice court, three in county court and five in district court, against Fred W. Baldwin, on claims aggregating over $70,000; that the above conveyances embraced practically all of the grantors' property, and left them insolvent; that, to sustain these conveyances, appellants asserted they were made in discharge of indebtedness of the parents to the son, except as to lot 12 in block 62, which was claimed to have been conveyed in discharge of a trust under which the parents held it for the son till his coming of age. The referee finds: That the property in question was mostly derived from A. J. and Lucy B. Mattson, an uncle and aunt of Mrs. Baldwin, in whose family she was brought up, and who stood to her as parents; that Mattson H. Baldwin was born December 2, 1873, and named for the great uncle, A. J. Mattson; that the latter at some time prior to 1884 set aside $25,000 of securities in a tin box marked "Mattson H. Baldwin's Box and Contents," and placed in it, also, the following memorandum: "These inclosed notes and mortgages, and all their value, is to be delivered to Mattie Baldwin in case he outlives me, but either these papers or their equivalent amt. is to be delivered to him without any form of law, as this is a 'free gift to him' for his name from the owner of these papers, and no law or captious person, must interfere or thwart my wishes here expressed. A. J. Mattson." And in September, 1884, the following: "Prophetstown, Ill., Sept. 1884. The inclosed notes and mortgages are the free gift of A. J. Mattson to Mattie Baldwin. Some good, honest, capable man or woman,

must aid and assist him in care and collection of the in-
closed and make good use of this free gift to the little boy.
I was once a little boy myself and my only legacy was the
advice of a good father and pure and loving mother. A. J.
Mattson"; that A. J. Mattson retained the dominion and
control of the box till his death; that in 1884 he took out
$8,000 worth of securities and bought this lot 12 in block
62 with the proceeds, and later made a warranty deed of it
to Fred W. and Ida M. Baldwin, and in 1886 delivered
this deed to Ida M. Baldwin, and she and her husband held
the premises and enjoyed the income from them till 1896;
that A. J. Mattson was moved by the wish to provide a
more commodious home for Ida M. and Mattson H. Bald-
win, and, in the letters to the latter, spoke of it as "your
new home," and of a farm whose title was in the father,
as "your farm"; that at A. J. Mattson's death, in 1886,
$15,000 in securities were found in the box,—$2,000 in
addition to the $8,000 having been removed; that A. J.
Mattson left his estate to his wife, and she delivered the
box and contents to Mattson H. Baldwin, and added $2,000
to make the amount $25,000, with what had been paid for
lot 12, block 62; that in 1889 Lucy B. Mattson died, leav-
ing legacies of at least $33,150 each to Mattson H. Baldwin
and Ida M. Baldwin, and $28,150 to Fred W. Baldwin,—
these amounts in addition to the $17,000 previously re-
ceived by Mattson H. Baldwin; that at this time Mattson
H. Baldwin had been impliedly emancipated, and had re-
ceived into his own control the $17,000 from the box; that
Fred W. Baldwin was administrator of the estate of Lucy
B. Mattson, and was appointed guardian for his son; that
he receipted as such guardian for his son's legacies under
Mrs. Mattson's will, but turned over to the son special
legacies of $12,000 and took into his guardian accounts
only the remainder which came to the son as residuary
legatee of Mrs. Mattson; that Mattson H. Baldwin, during
his minority, with his father's knowledge and consent,
conducted a business under the name of Baldwin Tailor-
ing Company, which resulted in a loss to him; that the

51

father settled satisfactorily with the son, when he came
of age, for the $21,150 received as residuary legatee from
Mrs. Mattson; that the funds controlled by Mattson H.
Baldwin himself and those by his guardian were kept in
one bank account, on which both drew checks, and were
so confused that it was impossible to distinguish them, or
to audit the two funds separately; that no books of ac-
count were kept by the son and father, but while the
parents were solvent the husband and wife had separate
bank accounts; that there were sundry transactions by
which the guardian became indebted to the ward, which
should be treated as settled,—one being a pledge of the
ward's securities by the guardian to Mrs. E. A. Richards in
May, 1893, for the guardian's debt, which matter was ad-
justed in the guardian's final settlement; that thirteen
items of indebtedness, aggregating $4,088.93, of the father
to the son, were testified to in former legal proceedings
as settled by the conveyance of property in Prophetstown,
Ill.; that the notes were surrendered; that items aggregat-
ing $7,885, amounting, with interest to September, 1895,
to $9,963.06 of debts, minuted on one of the notes at about
that date, were all the valid indebtedness existing during
the time of these conveyances; that other notes of the par-
ents to Mattson H. Baldwin, aggregating $8,808.15, pro-
duced at the hearing, were not proved with the clearness
required in a contest with creditors to sustain transfers
to relatives; that certain vouchers, claimed to have been
lost in the course of proceedings in aid of execution on
plaintiff's small judgment, were lost, if at all, by defend-
ants' fault; that certain expenses of horses at races should
be deemed merged in the notes, and not items of indebt-
edness; that Ida M. Baldwin was not indebted to her son
when the conveyances were made; that the evidence of an
oral declaration of trust in favor of the son by A. J. Matt-
son at the time of delivering to the mother the deed for
lot 12 in block 62, was of doubtful admissibility, and in-
sufficient to establish such trust, considering the contin-
ued control of the property by the parents after the son's

majority, and until they were pressed by debts; that the deed indicates no such trust estate, and that the parents took a title in fee, uncharged with any trust for the benefit of the son. The referee also found that the son had actual knowledge of the condition of his father's affairs, and that the debts were pressing, and that he took the conveyances for the purpose of enabling the parents to avoid payment, and to hinder, delay and defraud plaintiff and other creditors. He also found that Mattson H. Baldwin in 1895, after his majority, represented to one of the plaintiff's directors, in a conference as to an extension of plaintiff's note, on the suggestion of a mortgage upon lot 12 in block 62, that "Uncle Mattson had given that to his mother for a home and she would not mortgage it."

The referee's conclusions of law were:

(1.) That placing the securities in the box, and marking it, did not carry title to Mattson H. Baldwin, and that the ownership in the securities remained in A. J. Mattson. (2.) That the title in lot 12 in block 62, on its purchase with means taken from the box, vested completely in A. J. Mattson. (3.) That the conveyance to Fred W. and Ida M. Baldwin vested complete title, uncharged with any trust. (4.) That the conveyance to the son was voluntary and fraudulent, and the property should be sold to pay judgments of plaintiff and of Burton Stock Car Company. (5.) That the conveyance to the son of the mother's property, lot 22 in Wallingford & Shamp's subdivision, and lots 1 and 2, block 9, in C. C. Burr's subdivision, were likewise voluntary and fraudulent, and the property should be subjected to the judgments of plaintiff and of the Burton Stock Car Company. (6.) That lot 2 of Wallingford & Shamp's subdivision was conveyed to the son without consideration, and in fraud of creditor's rights, and should be subjected to the judgments. (7.) That the amount of expressed consideration in bills of sale of the chattel property received by the son ($8,000) should be credited on the father's indebtedness, and the rest of such indebtedness ($1,963.06),

be charged as a first lien upon lots 1 and 22, in Fairbrother's subdivision, the south one-half of the northeast quarter of section 23, township 9 north, range 6 east, lot 4, block 5 in Houtz and Baldwin's subdivision, and the north one-half of the northeast quarter and north one-half of the northwest quarter of section 11, and the southwest quarter of section 3, in township 11 north, range 5 east, and the costs of this action and plaintiff's and Burton Stock Car Company's judgment as a second lien upon said premises; the costs to be first charge, should the property not suffice to pay in full.

Motion was made to vacate the referee's report and numerous exceptions were taken to the different findings of fact, and all were overruled. Exceptions to the first three conclusions of law were overruled. The exceptions to the next three conclusions of law were overruled, but the conclusions were modified to make them, in substance, as follows:

(4.) That the conveyance of lot 12, block 62, was fraudulent, and should be set aside, and premises sold to satisfy plaintiff's attachment lien and Burton Stock Car Company's judgment,—the latter as an equal lien on F. W. Baldwin's half interest. (5.) That lot 22 in Wallingford & Shamp's subdivision, and lots 1 and 2 in block 9 in C. O. Burr's subdivision, should be sold to satisfy plaintiff's attachment lien. (6.) That the assignment of bid in the foreclosure proceedings against Caroline Purdue was fraudulent, and the premises should be sold to satisfy the lien of plaintiff's attachment. Exceptions to the seventh conclusion of law were sustained. Plaintiff and the Burton Stock Car Company excepted to the modification of conclusions of law four to six and the sustaining of exceptions to the seventh one.

The court entered a decree in accordance with the six conclusions of the referee as modified, and the defendants Baldwin appeal; and the bank brings error because of the modifying of conclusions four to six, and the sustaining of exceptions to No. 7.

Appellants take up the dispute as to lot 12 in block 62 first. The actual facts are fairly represented by the referee's findings, so far as they go. The mother states that, when the deed was delivered to her, A. J. Mattson, then in his last illness, told her the property had been bought for Matt, and had been deeded to herself and husband to keep for him until he should come of age, and then it was to be deeded to him; that she received the deed to be held in trust until her son came of age; and that she so held the property. No one but herself and Mr. Mattson were present, so there is no one to contradict her. The deed had been made in October, 1885, and was retained by the grantor until September, 1886, on the occasion of Mrs. Baldwin's coming to attend his last sickness. The evidence was objected to as incompetent, seeking to establish a trust by parol, and to change the consideration named in the deed by proof of a different kind. The claim that there was a trust interest on the part of Mattson H. Baldwin in the contents of the box, and so in these premises, which were admittedly bought with a part of its contents, it hardly seems possible to allow. The memoranda show unmistakably an intent to hold the control of the property till the donor's death. The income from the securities, so far as appears, was never thought of as other than A. J. Mattson's private property. If the income was his, then the securities were also, and so far as concerns the referee's first proposition of law, that the ownership of the box and of its contents remained in Mr. Mattson till his death, there appears no ground of complaint on appellants' part. Assuming, then, that this lot 12 in block 62, and the money which bought it, was Mr. Mattson's, could he create a trust estate in favor of Mattson H. Baldwin by mere parol, in the very act of delivering to Ida M. Baldwin an absolute deed of the property to herself and her husband? If, as we think, the money paid for this property was Mattson's, and so the property was his also, and there was no resulting trust in favor of any one on his purchase of it, this would seem clearly to be creating an express

trust by parol. This can not be done under our statute. *Hansen v. Berthelsen,* 19 Nebr., 433, 441; *Dailey v. Kinsler,* 31 Nebr., 340, citing *Courvoirsier v. Bourier,* 3 Nebr., 55, 61; *O'Brien v. Gaslin,* 20 Nebr., 347.

It is asserted, however, that the acceptance of the deed created a moral obligation on the parent's part, which was discharged by the conveyance to Mattson H. Baldwin, and is sufficient to support such conveyance. To this proposition appellants cite *Cottrell v. Smith,* 63 Ia., 181; *Hoisington v. Ostrom,* 27 Kan., 110, and *Silvers v. Potter,* 48 N. J. Eq., 539. This last case is especially relied upon by appellants. In it a deed by a brother to a sister of property conveyed to him by a deed from his mother, absolute on its face, was upheld against his creditors, as having been made in discharge of a parol trust under which the deed from the mother was for the benefit of the grantee's brother and sisters. In that case the deed from the mother was "in consideration of one dollar and other valuable consideration," and so, also, was the deed to the sister. The New Jersey statute provides that no trust shall be shown by parol. That of Nebraska requires that none shall be so created. Upon these two points appellees seek to distinguish that case from the present one. In *Cottrell v. Smith,* a widow was assigned a share in fee simple of her husband's estate and by mistake it was given her free from incumbrances which absorbed the rest of the estate, and for which her proportion was really liable *pro rata.* Subsequently she conveyed to the heirs to correct the mistake, though under no legal obligation to do so. A creditor of hers attacked the conveyance as voluntary. The court upholds the conveyance, saying:. "No person is bound to hold for his creditors what in good morals does not belong to him, but to another." *Hoisington v. Ostrom* presents no analogy to the case under consideration. The only matters decided were the validity, as against other creditors, of a transfer of a drug stock to indemnify sureties, and the fact that the transferees were sureties. The appellees to this claim that Mattson Baldwin's moral

right under the parol trust is sufficient to sustain the deed, answer: First, that the consideration of the deed is named as $8,000, and one of another kind may not be proved when the deed is attacked for fraud by third parties; second, that the evidence is in truth, as the referee found, insufficient, when taken in connection with the circumstances of the case, to establish the parol trust. The referee, in ruling against the first contention, indicates his doubt as to the admissibility of evidence to change in its nature the consideration of a deed. Appellees earnestly insist that his ruling was wrong, and that no consideration different in kind from that recited may be proved. They cite *Burrage's Lessee v. Beardsley,* 16 Ohio, 438. In this case title was claimed through deed to the grantor's wife and children. Defendant claimed title through the same grantor by a subsequent mortgage and its foreclosure. The grantor had remained in possession and exercised ownership for years after making deed under which plaintiff claimed. That deed recited a consideration of $3,000. It was shown that nothing was paid, and this showing was held to do away with the right of possession under the deed, and all proof that the real consideration was blood and affection on the part of the grantor for his wife and children was rejected. This was sustained on appeal on the ground that, as against third parties, a deed accepted on one ground can not be sustained upon another; citing *Hinde's Lessee v. Longworth,* 11 Wheat. [U. S.], 199, 213; *Clarkson v. Hanway,* 2 Cox's Peere Williams [Eng.], 203; Chancellor Kent in *Hildreth v. Sands,* 2 Johns. Ch. [N. Y.], 35, 43; and 1 Phillips, Evidence, 549.

In Cowen & Hill's notes to the work last cited it is remarked that the English decisions only go so far as to hold that proof may not be given of a consideration of a different species from that named in the deed. 2d vol., 5th ed., 579.

Chancellor Kent, in *Hildreth v. Sands,* seems to have acted on *dicta* of the English cases, and held that where a deed is attacked for fraud the party is bound by the con-

sideration alleged. In that case $4,500 was the considera-
tion named. It was held inadequate, and that the grantee
could not be permitted to prove any additional,—at least,
none of another kind.

In *Patterson v. Lamson,* 45 Ohio St., 77, under a statute
providing that a wife's lands should descend to the hus-
band on her death intestate, if they came not by devise,
descent or deed of gift, it was held incompetent, in an at-
tempt to defeat the husband's right after the wife's de-
cease, to show by parol that lands conveyed to her for an
expressed money consideration paid by her were in fact
a gift from her father, and that the latter paid the consid-
eration.

In *Stoltz v. Vanatta,* 32 Week. L. Bul. [Ohio], 100,
a deed from a husband through a third party to his wife
purported to have been made in consideration of $1. The
property was alleged, by a creditor attacking the deed, to
be worth $2,000, and was admitted to be worth $1,600.
The answer alleged that by mistake of the scrivener vari-
ous valuable considerations passing from the wife to the
husband had been omitted. The court held that the deed
was a voluntary one on its face, and could not be trans-
formed into one for value by parol proof.

In *Henderson v. Dodd,* 1 Bailey Eq. [S. Car.], 138, as
in *Hinde's Lessee v. Longworth, supra,* evidence of the re-
lationship of the parties and of the actual consideration
was admitted, not to vary the consideration expressed,
but to rebut any inference of fraud upon a subsequent
creditor. What would be the holding as to pre-existing
debts is not indicated.

*Galbreath v. Cook,* 30 Ark., 417, holds that proof can
not be admitted to show that the real considera-
tion of a deed reciting a money payment of $100, was a
contract of marriage, and does so on the ground that the
parties to a deed attacked by a creditor for fraud, can
show no consideration of a different kind than recited.
The authority most relied upon was *Betts v. Union
Bank,* 1 Har. & G., 175,—a case of precisely similar na-

ture, argued by Reverdy Johnson and Chief Justice Taney, involving the same question. The latter case is reaffirmed in *Christopher v. Christopher,* 64 Md., 583, in a holding that a gift can not be proved to defeat a vendor's lien, where the deed of conveyance recites a money consideration.

*Houston v. Blackman,* 66 Ala., 559, is a holding that where a husband has made a deed to his wife, reciting a consideration of love and affection, the parties can not, when the deed is attacked as voluntary, defend it, as against debts existing when it was made, by parol proof of a valuable consideration.

*Scoggin v. Schloath,* 15 Ore., 380, 383, is a case where a small money consideration was recited in a deed, and proof tending to show, in addition, payment of a considerable pre-existing debt, was held admissible, as being of the same species as the recited consideration; but the evidence of the parties is found insufficient to establish the facts to the satisfaction of the court.

In *Leach v. Shelby,* 58 Miss., 681, however, a deed made to a young woman for an expressed consideration of $1,600 was attacked by the grantor's previous creditors as fraudulent, and was upheld, although it appeared by the evidence that no money was paid, but the real consideration was the marriage of the grantee to the grantor. The court says: "The deed is assailed for fraud. The charge is sought to be supported by evidence that while the deed purports to have been for $1,600 not a cent was paid or intended to be paid. It is competent to show that although the valuable consideration mentioned did not exist, another valuable consideration did exist, and, therefore, that the deed was not fraudulent or voluntary. The assailant of a conveyance for fraud may show the truth as to its consideration whatever are its statements. He who is interested to uphold the conveyance is entitled to show the real consideration in order to maintain it. Truth is the proper object of investigation and both parties should stand on the same

footing and have equal opportunity to establish it." Numerous cases are cited, and Wharton on Evidence, section 1046, to the effect that, while a party claiming under a deed is generally shut up to prove only a consideration of the nature of that recited, this rule does not apply when the consideration is impeached for fraud. In that case any actual consideration may be shown.

In *Lewis v. Brewster,* 57 Pa. St., 410, ejectment was brought by a husband's creditors on an execution sale of land, and the wife was permitted to show, on an issue as to fraud, that a deed to her by the husband's father was a gift to provide a home for the family, though the deed recited a money consideration. The case relied upon as warranting such action is *Jack v. Dougherty,* 3 Watts [Pa.], 151. In that case, on careful consideration, such evidence was admitted, not to change the instrument, but to rebut the presumption of fraud in the apparent consideration.

In *Toulmin v. Austin,* 5 Stew. & P. [Ala.], 410, on a contest between a purchaser at execution sale on a levy against the husband and a wife's trustee, the latter was allowed to support a deed reciting a money consideration by evidence that it was made pursuant to a marriage settlement.

*Brown v. Lunt,* 37 Me., 423, was a case where a deed had been made to a merchant in March, by one indebted to him to secure payment of the debt and also advances to clear the land of incumbrances. In April he conveyed to his grantor's wife, taking two notes, of $1,000 each, signed by her and indorsed by the husband, and secured by a mortgage on the land. This was agreed upon as the amount due the merchant. The farm was worth $10,000 to $12,000, and the deed to the wife recited a money consideration. In May the merchant failed, and his creditors attacked the deed. The court not only permitted the parol trust on which he had obtained title to be shown, but found that the deed was upon sufficient consideration, although the parol trust was unenforceable. This consideration was held to be not so inconsistent with the one named in the deed that it might not be proved.

A precisely opposite holding in *Smith v. Lane*, 3 Pick. [Mass.], 205, is discussed and disapproved. In the last case a woman, whose husband had conveyed his life estate in some lands occupied by her to her father, was refused permission to prove against the father's creditors that a conveyance to her, for an expressed small money consideration, was really in discharge of a parol trust in her favor.

In *Bullard v. Briggs*, 7 Pick., 533, the Massachusetts court seems to have followed the principle of the Maine case, and admitted evidence of the trust to rebut a claim of fraud.

In *Velten v. Carmack*, 23 Ore., 282, a woman conveyed some lands during coverture without her husband's signature. A statute of that state authorized her to do this if the land came by gift, inheritance or devise. Otherwise it could only be conveyed by a joint deed of husband and wife. The property had been conveyed to the woman by her father for an expressed consideration of $1,000. It was held that her grantee, as against the daughter's creditors, might show that the real consideration of her father's deed was blood and affection and the land a gift.

In *Eystra v. Capelle*, 61 Mo., 578, in an effort to collect a part of the consideration for a deed, the evidence, as in the case now before us, was admitted, but was held insufficient on the ground that "to show that the consideration for a deed was other than that named in it, the evidence must be of the most clear and satisfactory character."

The precedents are thus conflicting as to the admission of evidence to vary the consideration of a deed, but we think the ground on which it was admitted in *Hinde's Lessee v. Longworth*, 11 Wheat. [U. S.], 198, 213, is good here, notwithstanding the plaintiff is not a subsequent creditor. The real question is whether the transfer from the parents to the son was fraudulent. The conveyance having been attacked as fraudulent because the consideration was not paid, any evidence going to rebut the presumption of fraud so arising is admissible. The $8,000 recited in the deed was not paid. Plaintiff alleged it was

not. Fraud is, by statute, always a question of fact in this state; but under the circumstances, if the deed was merely voluntary, it would be presumed fraudulent. The moral consideration of an actual trust, however, would, we think, if clearly established, support the deed. The showing of it to rebut the presumption of fraud was, we think, in accordance with principle and the better authority, as well as with our statute making fraud a question of fact. It was also in accordance with the spirit, at least, of section 339 of the Code of Civil Procedure, allowing the whole matter necessary to make any detached fact understood to be given in evidence. As was said in *Leach v. Shelby*, 58 Miss., 681, the object of the investigation is to ascertain the truth, and where plaintiff was denying the deed's recitals, and was proving the actual facts, it would seem mere justice that defendant be allowed to repel the inference of fraud by showing them all. We conclude the referee was not wrong in holding that an honest parol trust would support an executed deed, and might be shown when attacked by creditors, although the only recital in the deed was of $8,000 cash consideration.

Was the existence of the trust established? The direct evidence was given by Mrs. Baldwin, and has been stated. The corroboration is in the way of expressions of affection for the boy, and of the intention with respect to the property, on the part of A. J. Mattson. They are fairly, but not very fully, indicated in the referee's findings. Mr. Mattson's letters were numerous, and his expressions of affection strong, but the references to the property naturally few. As the referee finds, he on one occasion refers to the premises as "your new home," and again as "your home," in letters to Mattson H. Baldwin. The latter testifies that in 1885 Mr. Mattson told him that the property had been deeded or would be deeded to his parents to hold for him until he came of age. The resources of the Baldwin family, as the referee found, came generally from Mr. Mattson. He seems to have been very far from feeling any distrust of Mattson H. Baldwin's parents, and the

idea of protecting the boy or the property he was provid-
ing for him from them seems never to have occurred either
to Mr. Mattson or to his wife.  The latter, it is true, di-
vided her estate among the three in a way to indicate a
separation of interests, but took no steps to secure the
son's part against encroachments by his parents.   Mr.
Mattson was a business man of experience.  He seems, by
his letter-heads, to have been a notary and police justice.
He made the deed to the parents jointly.  It was executed
in October, 1885, and was delivered in September, 1886,
according to Mrs. Baldwin's statement.  The family was
living in the house at that time.  There is nothing in the
relation of the parties, or in their treatment of the prop-
erty, to suggest that it was not intended to be what it re-
mained until the bulk of the Mattson estate came into the
family in 1889,—the family home.  About that time a dif-
ferent one was found, and there is evidence that in 1890
Mrs. Baldwin was getting the rents from this property,
and that she and her husband continued to do so until
some time in April, 1896.  At least Mattson H. Baldwin
is not sure that he collected any rent before that time.
The rent for April, 1896, was receipted for by F. W. Bald-
win in his own name, and for May in the name of his son.
As is remarked in the recent case of *Doane v. Dunham,* 64
Nebr., 135, "Parol evidence to establish a resulting trust
must be clear, unequivocal and convincing."  It seems cer-
tain that, while A. J. Mattson intended to provide for his
godson in buying this Lincoln property it was through his
parents, and not by vesting him with any absolute interest
in the property.  The actions of the parties in holding the
beneficial interest in the property, and the conveyance to
the parents, are themselves evidence against the mother's
statement.   The declaration on the part of the son and
father, testified to by one of the bank directors, that the
property was the mother's and the son's acquiescence in
the statement, from the records, that it was the joint prop-
erty of the father and mother, at the very time of giving
credit to the mother, which is sworn to by the cashier, and

the vice-president's statement of his hearing the son's declarations that his mother had property, and was good for the $8,000 (amount of the note under consideration), are all denied by the Baldwins, but were accepted apparently by the referee as true,—the one to the director, Dr. Dayton, expressly so, in the findings. This was made, if at all, in October, 1895, and almost a year after Mattson H. Baldwin, by the mother's statement, was entitled to a deed, and within a few days after the date of the deed to him. The evidence, as a whole, entirely fails to convince us that the referee was wrong in finding that there was no moral consideration behind this deed. Notwithstanding the fact that the purchase by Mr. Mattson was with funds from the box he had labelled "Mattson H. Baldwin's Box and Contents," and that the mother says the deed was given to her with an injunction that she and her husband were to deed the property to the boy when he came of age, the moral claim of these creditors seems stronger than his, in view of all the circumstances of the transfer. We think the decree of the court as to this property should be affirmed.

The same conclusion has been reached as to the rest of the property attached. The title to it was in Mrs. Baldwin till its conveyance to her son. It is claimed that it was her equitable right to give it to him in payment of her husband's indebtedness, and that some of it was in fact held in trust for him,—was obtained through foreclosure on loans in her name, but made with his money, and had been improved with his money. This last consideration is claimed only as to some of it, and, if true, would not support a conveyance of it all in fraud of plaintiff's rights. Her obligation to plaintiff bound her separate estate. She was under none to her husband's creditors, nor to her son, as one of them. The referee, on the strength of her own testimony, found the mother was not indebted to the son, and that all her deeds were fraudulent as against the plaintiff. No definite portion of the consideration of the deeds is pointed out as due to the son or belonging to the son, ex-

cept that the mortgage foreclosure decree and bid on lot 2 in Wallingford & Shamp's subdivision, are claimed to have been based on a loan of his money in the mother's name. No voucher was produced. The father and son both swear that they know the son's money was used in the transaction, and the mother says she knows nothing about it. The evidence shows that the father and son are entirely helpless to separate their funds and distinguish their separate property, or to determine what matters have been repaid and what have not. The referee's conclusion that the son's claim was not sustained seems the only one to be reached from such evidence.

The foregoing disposes of defendant's appeal.

Plaintiff, as before stated, brings error, complaining that the action of the court, after sustaining the referee's findings of fact, was erroneous, in giving plaintiff no relief as to any but the attached property. As above stated, it is impossible to read this testimony without concluding that there is here ample evidence to sustain the referee's findings as to the facts. It is totally impossible from this evidence to strike any general balance of indebtedness to uphold all of the conveyances, regarded as one transaction, and it is equally impossible to trace out any particular portion which went to make up the consideration of any one. The father and son themselves do not profess to know, in most instances, what particular items of indebtedness made up the consideration of any particular conveyance, and entirely give up, in most cases, any attempt to harmonize the amount of such items with that named as the consideration of any conveyance. In one case in which they do so (that of the Prophetstown property) they are shown to have made entirely contradictory statements in the proceedings in aid of execution in 1896. The mother testifies only as to lot 12 in block 62. The father and son had simply handled their property together until it was inextricably mingled and held in the father's name for the most part, and, when debts became pressing, he had put it all in the son's name. Under these circumstances, there

seems no question of the correctness of the trial court's action in sustaining the referee's findings that these transfers were not sustained by proof of consideration definite enough to uphold conveyances between relatives. That the transfers were with full knowledge of the condition of affairs, and to hinder and delay creditors, is equally clear. The action of the trial court, then, in refusing plaintiff any relief as to the property of Fred W. Baldwin conveyed to the son, must have been based upon the fact that the only property specifically asked to be sold is that attached. The prayer of the petition, however, is to cancel all the conveyances, and general relief is asked. Defendants, however, claim that this bill is merely brought to enforce the attachment lien, and the relief can not be extended to include other property. This seems a mistake. The scope of the bill is clearly wider than a mere enforcement of the attachment lien. It includes relief on another judgment not connected with the attachment case. It sets out the judgment in the attachment case itself, and it attacks many conveyances of property not seized by attachment. Under the facts pleaded, and those found by the referee, as to the fraudulent character of all the conveyances, and the son's participation in the fraud, plaintiff is entitled to the additional relief, if it is recoverable under the prayer, and is reasonably needed. Defendants say that it is not needed, and is inconsistent with the prayer that the property be sold under the writ of attachment. They cite *Lord Walpole v. Lord Orford,* 3 Ves. [Eng.], 402, to the proposition that the prayer for general relief admits of nothing inconsistent with that specifically asked for. In that case the court held that the complainant could not recover as legatee under the codicil to a will of 1752, and at the same time have that will set aside on his general prayer in favor of a later one. We do not, however, see anything inconsistent in allowing specifically a sale of certain lands attached, and under the prayer for general relief, if the attached premises are insufficient, a sale of other lands to which a right is pleaded and proved.

*Williams v. Hubbard,* Walker's Ch. [Mich.], 28. In the case just cited it was held that plaintiff, if a conveyance of land was fraudulent, and was so pleaded and shown, might have relief as against it under a general prayer, together with specific relief as to property levied on. To a similar effect is *Clarkson v. De Peyster,* 3 Pai. Ch. [N. Y.], 319, 322. *Treadwell v. Brown,* 44 N. H., 551, gives effect to the general prayer in setting aside conveyances when not inconsistent with the specific relief prayed, though the latter is denied. It is not thought that our Code provisions have changed the rule. Code of Civil Procedure, sec. 92. If the facts found by the referee and affirmed by the trial court really existed, and there should be need of additional property to satisfy both of the plaintiff's judgments, there seems no objection to ordering a sale of other property, though it is not specifically prayed.

Counsel for appellants ask on what ground, if the son has a first lien for the discharge of indebtedness due him, is he compelled to take second-hand chattel property, instead of selecting himself the part to which such lien attaches? To us it seems more pertinent to inquire why, if the action of Mattson H. Baldwin was fraudulent, and was a participation in a fraud by his parents, with full knowledge, he was given any lien whatever? No attempt will be made here to adjust any account between father and son. It seems probable that the referee's finding in this respect understated the real indebtedness, if it be held that the son's money turned, without reckoning or accounting, into his father's hands, handled by the latter largely under the name of F. W. Baldwin & Son, with the son's assent, and lost in such business, created an indebtedness. It is possible, but, as the referee said, by no means clear, that all of the notes claimed would have come nearer the true amount. We are unable, however, to find that the transactions were an effort in good faith, and with due regard to the rights of creditors, to get what belonged to him, on the part of the son. The intimate business as well as family relations of the parties, the withholding of the

52

deeds from the records, the utter looseness with which the business was transacted, not only in its beginning, but after the result to the creditors became apparent, and the conflicting statements of the parties at different times, are sufficient to avoid the whole line of conveyances, and stamp them, as the referee found, fraudulent. The referee's finding of an active participation on the son's part, both before and after his majority, in the management of what was in fact a joint estate, kept chiefly in the father's name, is supported by the proofs. For the results of such management the son was largely responsible and, after misfortune came, had no right to secure himself, in the manner attempted here, by secret conveyances of all the property available to pay creditors. In such a view it becomes immaterial as to whether there was some genuine indebtedness or not. Its amount is material to this controversy only as it tends to sustain or disprove the claim of good faith.

It is recommended that the decree of the district court so far as it directed a sale of property to pay plaintiff's judgment, be affirmed, and, so far as it released the property not attached, be reversed, and that the attached property be directed to be first sold, and, if insufficient to pay the costs of this action and the decree, that the other premises mentioned in the seventh finding of the referee, or so much thereof as may be necessary for the purpose, be sold, and the proceeds so applied.

DAY and KIRKPATRICK, CC., concur.

By the Court: For the reasons given in the foregoing opinion, the decree of the district court, so far as it directed a sale of property to pay plaintiff's judgment, is affirmed, and, so far as it released the property not attached, is reversed, and the attached property is directed to be first sold and if insufficient to pay the costs of this action and the decree, then the other premises mentioned in the seventh finding of the referee, or so much thereof as

may be necessary for the purpose, be sold, and the proceeds so applied.

JUDGMENT ACCORDINGLY.