GEORGE R. BUCKNER ET AL., APPELLEES, V. WILLIAM B. McHUGH ET AL., APPELLANTS: LANCASTER COUNTY BANK ET AL., APPELLEES.

FILED JUNE 16, 1932. No. 28156.

*George A. Adams* and *Herman Ginsburg,* for appellants.

*John J. Ledwith, H. N. Mattley, James L. Brown, T. F. A. Williams* and *W. A. Selleck, contra.*

Heard before Goss, C. J., Rose, Dean, Good, Day and Paine, JJ., and Hastings, District Judge.

Good, J.

This is a creditor's suit in equity to compel the application of property, owned by the debtor but held for him in the name of another, to the satisfaction of judgments owned by the creditors. Plaintiff and interveners Dasenbrock seek to reach and apply to the satisfaction of judgments, held by them, a claim for $16,275, filed by William B. McHugh against the estate of George W. Stabler, deceased, on the ground that the claim was, in fact, the property of Bartley McHugh, the judgment debtor.

Defendants Bartley and William B. McHugh, as defenses, pleaded the statute of limitations, laches, and alleged that the claim against the estate of decedent was the property of William B. McHugh.

The trial court found for plaintiff and interveners Dasenbrock and enjoined the McHughs from selling, assigning or otherwise disposing of the claim, and ordered and directed the defendant Lincoln National Bank & Trust Company, as administrator of the estate of Stabler, not to pay any of the claim to the McHughs, but to pay the same to the plaintiff and interveners Dasenbrock, to the extent of their judgment claims. William B. and Bartley McHugh have appealed.

Defendants Bartley and William B. McHugh are father and son. In 1918 Bartley McHugh was the owner of 160 acres of land in Lancaster county, which he had contracted to sell for a consideration of $28,800; the contract to be closed and deed executed March 1, 1919. In the latter part of August, 1918, Bartley McHugh borrowed $2,700 from the bank of which the plaintiff was president. There is credible evidence that when he executed the note for the amount borrowed he deposited therewith the land contract as collateral security for his note, and stated that

the closing of the sale contract would occur at that bank; that when settlement was made for his land the note was to be paid out of the proceeds. About the same time he borrowed money from other banks, giving his notes therefor, and there is evidence tending to show that he agreed that these notes should be paid out of the purchase price of the farm which he had contracted to sell. Instead of closing the contract for the sale of his land at the banks from which he had secured these loans, he closed the deal at another bank and received a check for something over $19,000. This check he immediately converted into a bank draft for ·17,000 and some odd dollars and some cash. On the same day he took the draft to a bank in Lincoln and obtained cash therefor.

Bartley McHugh testified that he took the $17,000 cash to his home and put it in a trunk, leaving it there for, perhaps, a week, or longer, when he turned over to his son $15,200. The son, William B. McHugh, testified that he kept the $15,200 in a dresser drawer in his home for a few days, when, as he and his father and sister testified, the three went to Omaha, the son taking with him $12,000 or $13,000 in cash; that the son contemplated buying government bonds; that when they reached Omaha the father left the son and daughter, the son being only a little more than 21 years of age, and the daughter still younger, and went to visit a relative, while the son and daughter went to the business section of the city to look for a bank; that a bank was found, but it was closed and they could not enter; that they found a safe deposit company in the basement of the bank building; that they went in and rented a safe deposit box and placed therein the $12,000 or $13,000 in currency. They were unable to tell the name of the bank or the name of the safe deposit company, on what street the building was located, or whether it faced east, west, north or south; were unable to name any officer or person connected with the company, and were unable to state for how long a time the box was rented or what rental was paid therefor. The

son testified that this money remained in the safe deposit box, and that he never returned to it until about two years later when he arranged for a loan of $12,000 to George W. Stabler, a close personal friend of his father; that on the day this loan was made he, with his father and Stabler, went to Omaha and there obtained the money from the safe deposit box. He and his father testified that the money was turned over to Stabler, who gave his note therefor at that time; that the same day they returned to Lincoln and went to Stabler's home where Mrs. Stabler also signed the note.

Mrs. Stabler testified that on the evening in question Bartley McHugh came home with her husband; that the former stayed overnight at their home, and that William B. McHugh was not there; that she was requested to sign the note. She made some inquiries and was informed in the presence of Bartley McHugh that it was his money which Mr. Stabler was borrowing, and she was admonished, in the presence of Bartley McHugh, "not to breathe a word" about the transaction. Interest was paid upon this note by Stabler from time to time until his death, which occurred in 1929, and credits were indorsed on the back of the note. It is significant that these credits are not in the handwriting of William B. McHugh, but appear to be in that of his sister. After Stabler's death it was necessary that a claim should be filed against his estate. It appears also that there was a second note for $1,000, given by Stabler to William B. McHugh, and that all the money that was loaned to Stabler came out of the proceeds of the sale of Bartley McHugh's land.

One of the banks that had made the loan to Bartley McHugh obtained a judgment thereon and was unable to find any property out of which to satisfy the judgment. In 1920 the bank obtained service on Bartley McHugh and caused him to submit to an examination, to disclose what had become of his property. At that time he used a written statement in which he claimed the manner of disposition of all the proceeds from the sale of the farm, and it

is significant that at that time no mention was made of the $15,200 which he claims was turned over to his son, but he did mention $600 which he claimed to have paid to his son either for wages or expenses. The evidence also shows that the son was consulted with reference to the preparation of this statement.

The record discloses that after Bartley McHugh had acquired title to the 160 acres in question he transferred the title to his wife, and that title remained in her for a number of years, but that when she was in ill health and nearing the end of life she reconveyed the land to Bartley McHugh. She died in 1908. Defendants McHugh claim that 80 acres of this land was originally paid for by money belonging to Mrs. Bartley McHugh; that when she reconveyed the land to her husband there was a parol agreement that the 80-acre tract of land was to be conveyed to William B. McHugh when he became of age or married. Bartley McHugh testified that he consulted with his son and that they agreed that it was better to sell the land and pay William B. the proceeds of the sale, rather than convey the land to him; that the $15,200 which was turned over to him represented the 80 acres of land that was intended to be conveyed to him, together with his half-interest in the personal property on the farm.

It is significant that when Bartley McHugh was examined in 1920 no statement was made relative to the $15,200 turned over, nor to the fact that William B. McHugh had any interest in the land or the proceeds thereof. It also appears that in July, 1918, William B. McHugh filled out a questionnaire, pursuant to an order of the war department, in which he stated that he was engaged in farming, renting land from his father for a share of the crop; that he paid two-thirds of the crop as rental, and he made a statement as to ownership of his property, being two horses; that he was then 21 years of age. There was no mention that he was the equitable owner of the land or any part thereof. Practically the only testimony with reference to the parol trust, claimed to

have been created when Mrs. McHugh reconveyed the land to her husband, Bartley McHugh, is furnished by the McHughs and their relatives.

There are many contradictions and discrepancies in the testimony which it is needless to set forth herein. Suffice it to say that the testimony of defendants McHugh did not impress the trial court; nor are we, after reading the record, impressed with the credibility of their testimony. On the contrary, the stories, as detailed by them, seem rather a belated attempt to further delay the creditors of Bartley McHugh in obtaining satisfaction of their just claims.

It is a rule of law that transactions between parent and child, by which property is transferred by one who is unable to pay his just debts, should be carefully scrutinized; such transactions are presumptively fraudulent, and the burden is on him who asserts the good faith thereof to prove it. *Light v. Kennard,* 11 Neb. 129.

In *Seeley v. Ritchey,* 76 Neb. 427, it was held: "The rule is well settled in this state that a conveyance made by a father to his son, or other near relative, is presumptively fraudulent as to existing creditors." On a rehearing of that case, reported in 76 Neb. 433, it was held: "A transfer of real estate by a debtor to a near relative is looked upon with suspicion, and the burden of proving the *bona fides* of the transaction is upon the grantee." And it is an equally well-established rule that parol evidence to establish a trust must be clear, unequivocal and convincing. In *Doane v. Dunham,* 64 Neb. 135, this court held: "Parol evidence to establish a resulting trust must be clear, unequivocal and convincing." The same rule was reaffirmed in *Columbia Nat. Bank of Lincoln v. Baldwin,* 64 Neb. 732. See, also, *Davis v. Davis,* 112 Neb. 178, and *Klamp v. Klamp,* 51 Neb. 17.

It is contended on behalf of the McHughs that plaintiff and interveners Dasenbrock cannot recover in this action because they were not, at the time the Stabler notes were made payable to William B. McHugh, the

owners of the judgments which they now seek to enforce. This contention cannot be upheld. From the record it is apparent that the Stabler notes are the property of Bartley McHugh, notwithstanding they were made payable to William B. McHugh. They were made so payable for the purpose of covering up and hiding their true ownership from the creditors of the actual owner.

A court of equity will enforce the application of a debtor's property to the payment of his just obligations which have been reduced to judgment, notwithstanding the property may be placed in possession or in the name of another to hold for him. It is immaterial that plaintiff and interveners did not become the owners of the judgments in question until after the notes were taken in the name of William B. McHugh. They are now the owners of the judgments, and Bartley McHugh, the judgment debtor, is now, and at all times has been, the owner of the notes which form the basis of the claim against the Stabler estate. That claim is the property of Bartley McHugh. It is subject, and a court of equity will enforce its application, to the payment of the judgments in question.

In *Pierstoff v. Jorges*, 86 Wis. 128, in substance it was said that the nature, purpose and scope of a creditor's bill is merely to bring into exercise the equitable powers of the court to enforce the satisfaction of a judgment by means of an equitable execution because execution at law cannot be had. To the same effect is *Hadden v. Spader*, 20 Johns. (N. Y.) 554. See, also, *Weed v. Pierce*, 9 Cow. (N. Y.) 722.

In *Waddingham's Exrs. v. Loker*, 44 Mo. 132, it was held: "The law will not permit a man to withdraw his property from his creditors. Nor can a man owing debts be permitted to devote his capital, industry, or credit to the accumulation of property to be held by some third person, for his own use or that of his family, to the exclusion of his creditors. In all such cases the law intervenes and goes behind the fraudulent and secret trans-

actions, and subjects the property or trust funds to the payment of just and legal demands."

In *Brundage v. Cheneworth,* 101 Ia. 256, it was held: "A conveyance of land to a grantor's wife, on the agreement that he was to remain the actual owner of the entire beneficial interest, and that his wife was to hold the property in trust for him, is fraudulent as to both existing and subsequent creditors." See, also, *Kelley v. Bell,* 172 Ind. 590.

The record discloses that plaintiff and interveners did not discover, or have any means of knowing, that Bartley McHugh had caused a part of the proceeds from the sale of his farm to be loaned to Stabler, and notes taken in the name of William B. McHugh, until such claim was filed against the Stabler estate in 1929. These actions were begun very shortly thereafter. It is apparent, therefore, that the plea of the statute of limitations is not applicable; nor have plaintiff and interveners been guilty of any laches in the bringing of these actions.

The judgment of the district court appears to be free from error and is therefore

AFFIRMED.