ALFREA A. EVERS, ALSO KNOWN AS A. E. EVERS, APPELLANT,
v. EDWARD H. EVERS ET AL., APPELLEES.

18 N. W. 2d 673

FILED MAY 11, 1945.   No. 31895.

*Gray & Brumbaugh,* for appellant.

*Frost & Hammes, Ivan Van Steenberg* and *Sam Klaver,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is a suit to foreclose a real estate mortgage on a half section of Kimball County land. Edward H. Evers and his wife Emma, makers of the note and mortgage, Frances H. Chriss, administratrix of the estate of Edward R. Chriss, deceased, and the tenant in possession, are made defendants.

The plaintiff's petition alleged in substance the execution by defendants Evers of a promissory note dated March 1, 1934, due March 1, 1937, in the amount of $7,000, with interest. To secure the note, defendants Evers executed a mortgage covering land described in the petition. In consideration of all payments made, which included no part of the principal, there was due as principal and interest $9,-909.31. The administratrix of the estate of Edward R. Chriss, deceased, had, or claimed to have, some interest in the land, which interest, if any, is subordinate to that of the plaintiff's. The prayer was for decree of foreclosure, order of sale, application of the proceeds thereof to the mortgage indebtedness, and a deficiency judgment if such amount was insufficient to retire the indebtedness.

The administratrix, by answer, alleged, after denying the facts not admitted: that she was the sole owner of the land; that the note and mortgage were fraudulently executed by defendant Evers to their son, the plaintiff, in anticipation of a suit and judgment for the wrongful death of Edward R. Chriss, deceased, her husband; and that the plaintiff was employed by the defendants Evers at the time of the wrongful death of the defendant's decedent and was a party to the fraudulent scheme.

The cross-petition of the administratrix set out certain matters that are covered in the opinion. The prayer was to have the mortgage upon which suit is brought canceled, set

aside, and declared fraudulent as to her, and title to the premises therein described quieted as to the void mortgage, and to recover costs expended.

The defendants Evers' answer to the cross-petition contained a general denial; admitted that Edward H. Evers filed a petition in bankruptcy and after accounting for and surrendering for the benefit of the creditors all assets of which he was owner, that he was discharged in bankruptcy October 23, 1943; specifically denied that the note and mortgage referred to in the petition were executed in anticipation of suit or judgment for wrongful death of administratrix' decedent, but alleged they were executed on the dates they bear and for the considerations set forth therein.

The answer to the cross-petition and reply of plaintiff contained a general denial and also a specific denial that the note and mortgage were not executed in good faith for the consideration named therein; alleged that failure to record the mortgage until June 5, 1934, was the result of plaintiff's inexperience with business matters of that nature, and that lateness in so filing in no way affected any cause of action or remedy of the administratrix or any other person; and renewed the prayer of the petition.

After hearing, the court found generally for the defendant Frances H. Chriss, administratrix, upon her cross-petition and against plaintiff on his petition of foreclosure; canceled the note and mortgage as to the real estate, as far as the same affected the rights of the cross-petitioner; and quieted the title of Frances H. Chriss, administratrix, in and to the real estate as described in the pleadings. From this judgment and order of the court overruling plaintiff's motion for a new trial, plaintiff prosecutes this appeal.

The plaintiff first contends that the decree and judgment entered by the court is erroneous and not sustained by sufficient evidence.

For convenience, we will hereinafter in the opinion refer to Alfrea A. Evers, plaintiff and appellant, also known as A. E. Evers, as the son; to Edward H. Evers, one of the defendants, as the father; to Emma Evers, another defendant,

as the mother; to Frances H. Chriss, administratrix of the estate of Edward R. Chriss, deceased, appellee, as the cross-petitioner.

The record discloses that on February 6, 1934 the father and his partner, Rasmus Nelsen, entered into a lease with Harry Steinberg, leasing the premises described as 802-04-06 North 16th Street, Omaha, Nebraska. The purpose was to open a cabaret, or nightclub, to be named the Showboat. The rent, in the amount of $125 per month, started February 20, 1934, however the place at that time was not prepared for opening. Certain alterations had to be made, the floors sanded, and the walls decorated, the expense of which was to be borne by the lessees. The furnishings consisted of 60 tables with 4 chairs to each table; a lunch counter with 24 stools; 2 bars containing 6 beer taps; an orchestra pit to accommodate 10 musicians and a bandstand for the master of ceremonies and a singer. It is apparent that both the father and his partner had insufficient funds with which to start the project. The father owned the Kimball county land clear, with the exception that he claimed he had borrowed $2,000 from the son to clear it. The financial status of Nelson is not apparent, but it is claimed that he paid his share of the expenses out of his share of the profits from the business. The father, realizing that the funds were insufficient to complete the project, claimed he took the matter up with his son and the lessor who were present in the Showboat on March 1, 1934. The result was that the son agreed to loan the father $5,000. The lessor, being interested in the rent, accompanied the father and son to an attorney's office and introduced them to the attorney who thereafter assisted them in the drawing of certain instruments. At that time the father made out a note for $7,000, which was signed by him and the mother, dated March 1, 1934 and due March 1, 1937. As security therefor, on the same day, the father and mother made and executed a real estate mortgage in favor of the son, in the amount of $7,000. After this transaction the father and mother in their car, and the son in his, drove to Venice, Nebraska, 22 miles west of

Omaha, where the son resided and where his business was located. After arriving at the son's place, the father and son dug up some hidden fruit jars containing currency that had been buried by the son who stated that his reason for burying the money was that he did not have confidence in banks, and his grandfather and a friend had lost money in failed banks and that banks were failing with regularity. The money was counted out in 10 and 20 dollar bills, totaling $5,000 which was given to the father. The son's business which he had operated since 1930 and for which he paid rent not to exceed $150 per year, consisted of cabins, boats and a place where he sold homebrew, soft drinks and served sandwiches and had slot machines from which he received 40 per cent of the amount taken in by the machines. He also operated a dance hall. Through this enterprise, the best season was between March 15 and October 15, when he averaged $300 a week net. For the remainder of the year he averaged $150 per week. However, when beer was legalized his earnings dropped considerably.

The father claims to have used the $5,000 in payment of $800 for plumbing; for a counter, bars and lavatories, $1,500; a cooler for the basement $450, which was not large enough and was subsequently sold for $25; a compressor which cost $775 and a large box installed in the basement, costing $200. The cost of decorating the room was $350; the 60 tables cost $4.75 each; the 24 stools $100; a secondhand steam table $65 to $75; one large-size common ice box $125; 2 electric refrigerators $100 each; 5 secondhand cash registers ranging in price from $75 to $125. Utility deposits required before opening, $150 to $200; beer licenses in the amount of $600; 63 people were employed in the business and the monthly payroll amounted to $4,700.

The Showboat opened about March 15, 1934 and was operated for three or four years, and sold in the last year of the lease. The son was employed as a bartender in the establishment at a salary of $21 per week. He lived with his parents at the time, and at the time of the trial was employed as a taxicab driver.

On May 30, 1934, Edward R. Chriss and a companion visited the Showboat. During his visit some argument arose, and as a consequence he was invited to leave. On the outside of the establishment an altercation occurred between Chriss and one of the officers sent by the Department of Public Welfare of the city of Omaha at the cabaret's expense. As a result Chriss died an hour later.

On March 8, 1935 the cross-petitioner filed a petition for damages against the Showboat, a copartnership, the police officer and others. On March 14, 1936 the cross-petitioner procured a judgment against the father who did not appear at the time of the trial or file pleadings. The trial was had to the court without the intervention of a jury, and a judgment was rendered in favor of the cross-petitioner in the amount of $10,000. A transcript of this judgment was filed in the district court of Kimball county July 16, 1936, and execution was issued thereon August 9, 1943, and the land, as described in the pleadings, owned by the father, was sold to the cross-petitioner at sheriff's sale September 21, 1943. The sale was confirmed by the court November 15, 1943, and sheriff's deed filed of record conveying the title of such real estate to the cross-petitioner November 20, 1943.

On August 31, 1943, the father filed a voluntary petition in bankruptcy in the United States district court. The judgment of the cross-petitioner was listed as unsecured indebtedness in the amount of $15,000, and a disputed amount of $6 to a hospital was listed, the two constituting the total indebtedness of the father. Official form 2, designated "State of Affairs" filed by the father in the bankruptcy proceedings, shows the father's occupation to be that of a truck driver for the Dealers Transport Company, and shows the mortgage indebtedness to be $5,500, and the amount paid the year previous to the bankruptcy proceedings to the son on the mortgage indebtedness, $300.

The son brought this action to foreclose the real estate mortgage on the Kimball county land December 4, 1943. On June 5, 1934, the $7,000 real estate mortgage securing the note was recorded in Kimball county. On June 2, 1934

a chattel mortgage made by the father and his partner to his son, in the amount of $8,400 covering all of the equipment in the Showboat was filed of record in Douglas county. The son claimed to know nothing about this mortgage and it was presumably filed for record by the partner. It is admitted that there was no consideration for the mortgage and that the son had not given his father any such amount. This mortgage was dated May 12, 1934 and released by the son on the margin of the record in the county clerk's office in Douglas county May 5, 1937. The reason for releasing the mortgage was so that the Showboat could be sold.

The attorney who drafted the real estate mortgage also drafted the chattel mortgage and witnessed the chattel mortgage, and the same notary who notarized the real estate mortgage notarized the chattel mortgage. While the father claimed he and his wife and son had never met the attorneys who witnessed and acknowledged the instruments until introduced by Steinberg on March 1, 1934, the lease of February 6, 1934, discloses by the acknowledgment which was taken by the same notary, that the father as lessee, personally appeared before the notary.

The son contends that the evidence is insufficient to sustain the judgment of the court. We have set forth a brief summary of the evidence and will discuss other parts thereof, as occasion requires, in determining this appeal which is tried in this court de novo, as provided for in section 25-1925, R. S. 1943.

The son contends that the undisputed facts establish that his mortgage was acquired prior to the alleged tort of May 30, 1934, and that the cross-petitioner's position is that of a subsequent creditor and not an existing creditor; therefore the burden is upon the cross-petitioner to establish that the mortgage of the plaintiff was the result of a conspiracy on the part of the son and father to hinder, delay and defraud the cross-petitioner in collecting her judgment, and she has failed to establish her case; that the cross-petitioner's theory is that she is an existing creditor and so pleaded and is bound by her pleadings; and that in this connection the rule

cited in *Ayers v. Wolcott*, 66 Neb. 712, 92 N. W. 1036 and cases cited therein, govern. "The rule seems to be well settled that, to set aside a conveyance on the ground that it is fraudulent as to subsequent creditors, such creditors must allege and prove that such conveyance was made with intent to defraud subsequent creditors and in contemplation of such future indebtedness." Whether or not this rule is applicable depends upon the facts and the reasonable and legitimate inferences that may be drawn therefrom.

The question of fraudulent intent is a question of fact and not of law, when considered in the matter of the execution and delivery of a real estate mortgage charged to be made to hinder, delay and defraud creditors. See, *Hilton v. Clements*, 137 Neb. 791, 291 N. W. 483; *Luikart v. Detweiler*, 133 Neb. 614, 276 N. W. 395.

Intent to make a mortgage to defraud creditors may be established by proof of facts from which such inferences may reasonably be drawn. *Luikart v. Detweiler, supra; Farmers State Bank of Ewing v. Dierks*, 137 Neb. 442, 289 N. W. 860.

The trial court found that the note and mortgage set forth in the plaintiff's petition were executed by the father and mother to the son subsequent to the date of May 30, 1934, and on or about June 2, 1934, and was caused to be pre-dated back to March 1, 1934. The son predicates error on the finding that it is erroneous and not sustained by sufficient evidence. If this finding is true, the cross-petitioner would then be an existing creditor and not a subsequent creditor as contended for by the son. The cross-petitioner became a creditor of the father from the date of the tort resulting in the wrongful death of her decedent, which was May 30, 1934, and comes within the protection of section 36-401, R. S. 1943, pertaining to fraudulent conveyances. The statute provides in part as follows: "Every conveyance * * * , in writing * * * , of any estate or interest in lands, * * * and every charge upon lands, * * * made with the intent to hinder, delay or defraud creditors or persons, of their lawful rights, damages, * * * shall be void." It will

be observed the statute considers one having a claim for damages within its contemplation.

" * * * the well-nigh universal rule is that claims for damages arising from torts and not yet reduced to judgment are within the protection of the statutes against fraudulent conveyances, on the theory that where a conveyance is made after the liability accrued, but before suit, the judgment, once obtained, relates back and becomes a debt as of the time when the original cause of action accrued. Accordingly, persons who have been regarded as creditors within the meaning of such statutes include those having a cause of action for * * * death by wrongful act, * * * ." 37 C. J. S., sec. 75, pp. 915, 916.

At the time the cross-petitioner became a creditor, the son was living with his parents and employed in the Showboat as a bartender. On the day Edward R. Chriss lost his life both the father and son knew about the altercation, and knew the next day what had happened. At that time the Kimball county land, for all intents and purposes in so far as notice was concerned, was free and clear of encumbrances. The Showboat was clear of the $8,400 chattel mortgage and the only reason the father could give for executing it, as he testified: "Because I wanted to protect my interest", and his reason for recording the chattel mortgage was, as he testified: " * * * if anything would go wrong, I would be the total loser."

It is significant to note the close proximity of the time of the recording of the $8,400 chattel mortgage and the $7,000 real estate mortgage. The latter was sent by the son's attorney to Kimball county to be recorded. It reached it destination six days after the altercation and resulting death of Edward R. Chriss. The chattel mortgage was recorded three days after Chriss' death. The real estate mortgage and chattel mortgage discloses a total indebtedness owing from the father to the son the amount of $15,400. The only logical inference to be drawn from this evidence is that the father and son anticipated a lawsuit and judgment thereon for the wrongful death of the cross-petitioner's decedent.

It is proper in this connection to consider when it becomes material to show the motive or intent which inspired an act, or the knowledge under which one has acted, it is relevant for such purpose, under certain limitations, to prove other similar acts which explain such motive or bring home to the party the knowledge sought to be proved. Jones, Evidence (2d ed.) sec. 142. See *Masonic Bldg. Corporation v. Carlsen,* 128 Neb. 108, 258 N. W. 44.

"Evidence that the party or parties charged with making a fraudulent disposition of property were engaged at or about the same time in other similar fraudulent transactions is admissible to show fraudulent intent in making the transfer in controversy." 27 C. J. 807. See *Shepard v. Hamaker,* 120 Neb. 166, 231 N. W. 761.

At the time the father claimed to have borrowed $5,000 from the son, March 1, 1934, which brought about the execution of the $7,000 real estate mortgage, the record shows other indebtedness by the father with reference to the Showboat cabaret; a chattel mortgage for $500 on restaurant equipment filed March 5, 1934; a chattel mortgage for $500 on bar fixtures filed March 27, 1934; a chattel mortgage for $70 to purchase three cash registers.

It is significant to note the son, approximately two months before he claimed to have loaned his father the $5,000, gave a chattel mortgage for $126 on a secondhand automobile, January 5, 1934, payable at $21 per month.

The only witnesses who testified were the father and son. The counsel that drafted the instruments, witnessed and acknowledged them, the lessor and the partner, did not testify. "Where the testimony relied upon to show good faith is given by interested relatives only, the reasonableness or unreasonableness of their evidence has considerable weight in arriving at a just conclusion." *Hilton v. Clements, supra.*

The son relies upon the notary's acknowledgment and cites *Council Bluffs Savings Bank v. Smith,* 59 Neb. 90, 80 N. W. 270. "When the party executing a deed or mortgage knows that he is before an officer having authority to take acknowledgments, and intends to do whatever is necessary

to make the instrument effective, the acknowledging officer's official certificate will be, in the absence of fraud, conclusive in favor of those who in good faith rely on it." A notary's acknowledgment to a real estate mortgage is not conclusive that the instrument was executed and acknowledged on the date the acknowledgment bears. It is *prima facie* correct and cannot be impeached except for fraud, collusion or imposition. *Pereau v. Frederick,* 17 Neb. 117, 22 N. W. 235. "In this state the act of an officer in taking an acknowledgment of the grantor to a conveyance of real estate is a ministerial one." *Horbach v. Tyrrell,* 48 Neb. 514, 67 N. W. 485. See *Burbank v. Ellis,* 7 Neb. 156.

We conclude that the certificates of acknowledgment, under the facts, and the inferences reasonably and legitimately drawn therefrom, and the circumstances surrounding the real estate mortgage and the chattel mortgage, have been impeached. We can draw no other conclusion than did the trial court, that the real estate mortgage executed by the father to the son was subsequent to May 30, 1934, and that the legal status of the cross-petitioner is that of an existing creditor.

A conveyance between relatives which has the effect of hindering or delaying a creditor in the collection of his claim is presumptively fraudulent, and in litigation between the creditor and the parties to the conveyance over its alleged invalidity, the burden is on the parties to the conveyance to establish the good faith of the transaction. *McBride v. Helmricks,* 140 Neb. 843, 2 N. W. 2d 118; *Buckner v. Mc-Hugh,* 123 Neb. 396, 243 N. W. 119; *Hilton v. Clements, supra; Farmers State Bank of Ewing v. Dierks, supra.* The son has failed to meet the foregoing rule of law in his proof.

The trial court found that the note and mortgage were executed by the father and mother without consideration, and for the purpose and with the intent to hinder, delay and defraud the creditors of the father, and that the note and mortgage are void as to such creditors. The son predicates error on this finding, that it is erroneous and not sustained by sufficient evidence.

From the business in which the son was engaged at Venice, Nebraska, from and after 1930 and until he took up his employment as a bartender in the Showboat at a wage of $21 per week, it would indicate that he would have made out of his business, until the advent of legalized beer, approximately $12,500 per year. When the Showboat opened he was living with his parents. He had never filed a United States income return from 1930 to 1936 inclusive. He filed personal property tax schedules with the assessor of Douglas county April 18, 1934. The property listed, subject to taxation, was a secondhand automobile on which he had borrowed $126, and a $20 radio. Personal property returns for the years 1931, 1932 and 1933, also shown in evidence, listed a secondhand automobile; some household goods, exempt; a radio, and poultry valued at $10. None of these personal property returns show or include cash in any amount. In 1935 the son executed a chattel mortgage to his mother for $500 on his car, which chattel mortgage was admittedly without consideration, and was filed of record June 14, 1935. The purpose of executing this chattel mortgage was to cover his car in such manner as to keep his wife from interfering with it. At that time he was having trouble with her, due to a divorce action which he had filed. On August 3, 1935 a decree of divorce in favor of the wife as defendant and cross-petitioner was entered and is in evidence, showing a property settlement to the wife in the amount of $20 cash, and in addition her husband was to cancel a chattel mortgage of $100 and pay attorney fees amounting to $35. He testified he did not tell his wife that he had loaned his father $7,000. There is nothing in the record to show that the father ever deposited $5,000 in any bank. The record is void of books of accounts showing expenditures made by him after receipt of this amount. The only witness attempting to corroborate him is his son. The son made no deposits of interest collected on this indebtedness from his father, and kept no books of account with reference to his business.

In considering all of the evidence, the legitimate and rea-

sonable inferences to be drawn therefrom, and the circumstances surrounding this transaction, it is inconceivable to believe that the son ever loaned his father such an amount of money as $7,000. We agree with the court's findings heretofore set out in this respect, and for the reasons given in this opinion, the decree and judgment of the district court is affirmed.

AFFIRMED.