Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/21/2022 09:05 AM CDT

Lawrence E. Loeffler and Patricia K. Loeffler,
appellants and cross-appellees, v.
Robert J. Loeffler, appellee
and cross-appellant.
___ N.W.2d ___

Filed June 14, 2022.    No. A-21-546.

1. **Actions: Trusts: Equity: Judgments: Appeal and Error.** Actions to declare a resulting trust are in equity. In an appeal in an equity action, it is the duty of an appellate court to try issues of fact de novo upon the record and to reach an independent conclusion thereon without reference to the findings of the district court.

2. **Trusts: Property: Title: Equity: Proof.** A court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship.

3. **Trusts: Conveyances: Presumptions: Intent: Words and Phrases.** A resulting trust is one raised by implication of law and presumed always to have been contemplated by the parties; the intention of the resulting trust is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance.

4. **Trusts: Property: Consideration.** Where a transfer of property is made to one person and the purchase price or consideration is paid by another person, a resulting trust arises in favor of the person who made the payment or provided consideration.

5. **Trusts: Proof.** A resulting trust will not be declared upon doubtful and uncertain grounds; and the burden is upon the one claiming the existence of the trust to establish the facts upon which it is based by clear and satisfactory evidence.

6. **Trusts: Words and Phrases.** Where the alleged trust relationship is just as consistent with that of a gift or loan, courts will not ordinarily impress a resulting trust.

7. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the District Court for Boone County: Rachel A. Daugherty, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellants.

Jennifer D. Tricker and Spencer R. Murphy, of Baird Holm, L.L.P., for appellee.

Riedmann and Welch, Judges.

Riedmann, Judge.

## INTRODUCTION

Lawrence E. Loeffler (Larry) and Patricia K. Loeffler appeal the order of the district court for Boone County which denied their claim for quiet title, partition, constructive trust, conversion, and accounting. Robert J. Loeffler cross-appeals. For the reasons that follow, we affirm the district court's decision.

## BACKGROUND

Larry and Patricia, the appellants, filed a complaint on February 1, 2019, alleging that Larry and Robert formed a land purchasing joint venture in 1999 in order to purchase the family farm from their mother. According to the complaint, Larry's name was not included on purchase documents or the mortgage so that Robert would be in the best position to buy Larry's interest in the event of Larry's death, without Robert's having to do business with Patricia. Regardless, the farm would be owned by Larry and Robert as tenants in common, each owning a one-half interest. Larry and Patricia asserted that Robert held their portion of the land in a constructive trust and sought an order from the court directing him to

convey their portion to them, quieting title in their names, and thereafter partitioning the land.

Robert filed an answer, asserting that he was the sole owner of the farm and that Larry had no ownership interest in the property. He also asserted various affirmative defenses, including the statute of frauds. Trial was held on February 9, 2021, and the following evidence was adduced.

*Undisputed Evidence.*

Walter Loeffler and Lenore Loeffler had five children; in birth order, they are Marcine Jacobson, Larry, Robert, Marla Loeffler, and Mark Loeffler. The land in dispute is farmland located in Boone County, Nebraska. It has been in the Loeffler family since 1886. Walter predeceased Lenore, leaving her as the sole owner of the farm. Sometime after Walter died, Lenore expressed a desire to sell the land.

Lenore sold the farm in 1999, and Robert's name was on all the closing documents. Lenore retained a life estate, continuing to live on the farm until approximately 2010. Both prior to and after the sale, the farmland was leased to a tenant who paid cash rent. In 2012, Robert began farming approximately 70 acres of the farm, and the other half became part of the U.S. Department of Agriculture's Conservation Reserve Program (CRP).

Robert maintained a ledger in which he kept track of farming expenses. According to the ledger, in years that the farm operated at a deficit, from approximately 1999 through 2011, Larry paid half of the operating deficit and Robert paid the other half. In years there was a profit, Robert wrote "I owe" in the ledger.

Other undisputed facts include that Larry and Patricia were married at the time Lenore sold the land in 1999, although they did eventually divorce in 2006. Lenore passed away in 2013.

*Robert's Version of Events.*

According to Robert, he purchased the farm from his mother, Lenore, in 1999, with the intent to pass it on to his

son. Larry did not offer to purchase the farm with Robert, nor would Robert have accepted such an offer. The farm's purchase price was $134,000, with a $10,000 downpayment paid by Robert. He described a document written by Lenore prior to her passing that stated, "'Bob bought. Signed papers July 31st, 1999.'"

Since 1999, Robert has managed the farm. He was the one who dealt with the farm tenants and negotiated the agreements with them. He also has been the one responsible for upkeep on the farm, including fixing fences, placing tin on the roof of the house, jacking up the foundation, adding a stair rail on the house stairs, removing trees, mowing the grass, and removing the snow. Larry did not help with any of this. Robert was also the one responsible for making all payments on the land, which included paying the mortgage, insurance, and taxes.

Regarding the deficit payments received from Larry, Robert stated that those payments were loans. According to Robert, prior to selling the farm, Lenore asked Robert if his two brothers, Larry and Mark, would be willing to loan Robert money if the farm operated at a deficit. Mark declined to loan Robert the money because Mark had just bought an acreage. Larry, however, agreed that he would loan Robert one half of each year's deficit. Larry agreed to this because he could get better interest from Robert than he could at the bank and he did not want Patricia to know he had that money. No interest rate was agreed to by Larry and Robert, nor was a promissory note signed, but the agreement was to pay back 100 percent of the loans with a reasonable interest rate. The loan became due once the farm was paid for in full; the farm was paid off in 2020.

Robert maintained a ledger for three reasons: to show profits and losses, for tax purposes, and to track how much Larry had loaned him. Robert started the ledger in September 1999, and the final year accounted for was 2015. The first page indicates "Pd 10,000 down - July - 1999." The ledger tracked loan payments, taxes, insurance, rental income from

the tenant, farm repair receipts, et cetera. After calculating expenses and income, Robert determined what the deficit or profit would be for the year. For example, in 2000, the farm operated at a deficit of approximately $4,361. Larry loaned him $2,200 to help pay expenses on the farm, including the mortgage. Robert was responsible for the ledger, and he kept it at his house. In the ledger, Robert used words such as "Larry paid," "Larry owes," "[a]piece," and "I owe" regarding how much each brother would be responsible for that year.

Regarding the CRP, Robert testified he got the idea to enroll in the program after attending a party. Robert sat across the table from the manager of the office that "control[s] the CRP and . . . grasses." The manager explained the benefits of the CRP, and she invited Robert to the office to fill out paperwork and see the price per acre that Robert could get under the program. After filling out the paperwork, the price per acre was $134. To comply with the CRP, Robert had to sow the land with specific seeds, and Larry helped procure those seeds through his lawn care business connections. According to the ledger, Robert repaid Larry $5,125 for purchased CRP seed. Robert rented the equipment necessary to plant the seed and proceeded to do so. It was necessary for Robert, instead of the previous tenant, to start farming the other section of land because otherwise half of the CRP proceeds would go to that tenant.

The first time Robert became aware that Larry was claiming an ownership interest in the farm was in 2014 when Robert was advised by the CRP office staff that Larry had called, demanding that his name be added to the CRP contract. That began a series of conversations between Larry and Robert in which Robert tried to repay the loan. When that failed, Robert made some settlement offers in order to avoid litigation.

*Larry's Version of Events.*
According to Larry, he purchased the farm with Robert as co-owners. Robert had requested the farm be in his name,

so Robert signed the closing statement, the promissory note, and the mortgage and he received the deed. Larry was present at the closing. Larry paid half of the downpayment, but was unable to state in his deposition how he paid the $5,000; however, at trial, he testified that he recalled paying $5,000 in cash to Robert days after the closing. Robert never asked Larry to loan him money, nor did he discuss an interest rate, repayment terms, repayment date, or any particulars of a loan. In contrast, in 2006, Larry loaned between $28,000 and $30,000 at 6 percent interest to Lenore, with the remaining balance paid by Lenore's estate upon her death.

Larry testified that he performed maintenance work on the farm and house, repairing the foundation on the barn, rebuilding the cellar door, cleaning up trees on the property, screwing down the tin roof on the barn, fixing the roof on the house, and laying linoleum in the kitchen. Sometimes this work was done with Robert, and sometimes Larry completed it by himself. Both prior to and after the 1999 sale, Larry stored personal property in the barn.

Larry determined that the rent paid by the cash tenant was low and that the farm could make more money by participating in the CRP. Larry "did the foot work" on the CRP to identify the requirements to participate in the program. Larry's handwriting is throughout exhibit 29, a series of documents involving enrollment in the CRP, even though Robert is the one who signed the documents. Larry purchased approximately $5,000 worth of seed to comply with the requirements of the CRP, and he was paid back by the farm. Half of the farm was placed in the CRP, and half was farmed by Robert by agreement between the brothers. Robert agreed to pay the same rent as the CRP allowed per acre, resulting in the farm paying for itself.

When the farm started making money, Larry stated, "I asked to get — to be paid back for it for what the extra money that was coming in, and [Robert] always had a reason. He didn't have his checkbook with him." The first time Larry heard of a loan versus a partnership was when he received

a letter from Robert's attorney offering to pay him $20,000 for the money he had loaned Robert.

The brothers engaged in a series of email communication in 2016, in which they discussed the price of the farm for purposes of one of them "buying the other one out." Despite Larry's claim of ownership, when he took out a mortgage on an acreage in 2013, he did not list the farm as an asset in his application materials, nor did he include it as owned property during his divorce proceedings in 2006.

*Marla's Testimony.*

The only other witness to testify was Marla, called by Robert's attorney. She testified that after their father, Walter, passed away, Robert helped manage the farm and house. She referred to him as "Mom's right-hand man." According to Marla, around the time that Robert purchased the farm, Larry told her that he was loaning money to Robert. She was uncertain of the amount, but stated Larry's reason for doing so was because he could get better interest from Robert and he did not want Patricia to know he had that money. The better interest rate was the same reason that Larry loaned Lenore money while she was alive. The first time Marla heard Larry claim ownership in the farm was in 2015.

*District Court Decision.*

Following the trial, the district court issued an order finding that Larry and Patricia "failed to prove by clear and convincing evidence that [Robert] obtained the title to the property by fraud, misrepresentation, or an abuse of an influential or confidential relationship." The district court, therefore, denied Larry and Patricia's request for the imposition of a constructive trust.

The court further noted in its order that Larry and Patricia argued in their written closing argument that the parties intended to create a resulting trust. It rejected this argument, stating that "[a]s to the allegation of a resulting trust, even if the [c]ourt were to accept Larry's version of events,

the evidence is that the brothers had an oral agreement to transfer property. Under the circumstances, this oral agreement does not withstand the statute of frauds." Based on the district court's findings that no trust, constructive or resulting, should be imposed and that Larry and Patricia have no ownership interest in the farm, the remaining causes of action were denied. Larry and Patricia timely appealed.

## ASSIGNMENTS OF ERROR

The appellants assign that the district court erred in (1) failing to recognize that fraud at the outset is not required to prove a resulting trust and failing to find that a resulting trust was proved, (2) disregarding Patricia's interrogatory answer testimony without a basis to do so, (3) dismissing the complaint, and (4) failing to award rents and profits to the appellants. Robert cross-appeals, assigning that the district court erred in failing to dismiss the case because the allegations in the complaint are time barred by the statute of limitations.

## STANDARD OF REVIEW

[1] Actions to declare a resulting trust are in equity. *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021). In an appeal in an equity action, it is the duty of this court to try issues of fact de novo upon the record and to reach an independent conclusion thereon without reference to the findings of the district court. *Id.*

## ANALYSIS

*Oral Contract for Land and Resulting Trust.*

The appellants assign that the district court erred in failing to recognize that fraud at the outset is not required to prove a resulting trust and in failing to find a resulting trust was proved. In their complaint, the appellants proceeded under a theory of constructive trusts. However, following trial, but before written closing arguments were due, the Nebraska Supreme Court released *Dreesen Enters. v. Dreesen*, 308 Neb. 433, 954 N.W.2d 874 (2021).

[2] In *Dreesen Enters. v. Dreesen, supra*, the Supreme Court held that a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship. Because the movant in *Dreesen Enters*. knew that the property would not be titled in her name and voiced no objection, she was unable to meet her burden of proof and the court refused to impose a constructive trust.

Apparently recognizing the obstacle that the *Dreesen Enters*. opinion posed, the appellants argued in their written closing argument that a resulting trust was formed. The district court's order addressed constructive trusts, resulting trusts, and oral contracts for land. The district court found that the appellants failed to prove by clear and convincing evidence that Robert obtained the title to the property by fraud, misrepresentation, or an abuse of an influential or confidential relationship. Thus, a constructive trust was not formed.

As to the allegations of a resulting trust, the district court found that even if it accepted Larry's version of the events, the evidence established an oral agreement to transfer the property, which would be precluded by the statute of frauds. To the extent that the district court viewed the statute of frauds as a bar to a resulting trust, we disagree with its analysis. See *Reetz v. Olson*, 146 Neb. 621, 20 N.W.2d 687 (1945) (resulting trusts are exempt from statute of frauds). However, in our de novo review of the record, we determine that Larry failed to establish the existence of a resulting trust by clear and convincing evidence.

As an initial matter, we find that the appellants have abandoned their claim regarding constructive trusts, and we do not address the district court's order in regard to this claim. Additionally, we find no merit in the appellants' assertion that the district court required fraud at the outset to prove

a resulting trust. The district court's discussion of fraud is clearly relating to its analysis of constructive trusts and is an accurate application of *Dreesen Enters. v. Dreesen, supra*. We now turn to the issue of a resulting trust.

[3-6] A resulting trust is one raised by implication of law and presumed always to have been contemplated by the parties; the intention of the resulting trust is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance. *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021). Where a transfer of property is made to one person and the purchase price or consideration was paid by another person, a resulting trust arises in favor of the person who made the payment or provided consideration. *Id*. The court will impose a resulting trust when the circumstances surrounding a conveyance make it clear that the parties intended such a result. *Id.* A resulting trust will not be declared upon doubtful and uncertain grounds; and the burden is upon the one claiming the existence of the trust to establish the facts upon which it is based by clear and satisfactory evidence. *Biggerstaff v. Ostrand*, 199 Neb. 808, 261 N.W.2d 750 (1978). Where the alleged trust relationship is just as consistent with that of a gift or loan, courts will not ordinarily impress a resulting trust. *Id*.

In *Malousek v. Meyer, supra*, the trial court found that an estate's special administrator had not met his burden of showing a resulting trust for a boat. On appeal, the Supreme Court reversed, recognizing its duty to try issues of fact de novo to reach a conclusion independent of that of the trial court. The evidence was undisputed that the decedent had paid for the boat, that she had another person sign the purchase agreement, and that she had a third person sign the title. The trial court found that the special administrator failed to establish the elements of a resulting trust and had not rebutted the presumption that it was a gift to the title owner. On appeal, the Supreme Court explained that the decedent titled the boat in the name of another for reasons that benefited her and that she

paid all the major expenses associated with boat ownership. *Id*. Consequently, the court determined that the title owner held the boat in a resulting trust for the decedent's estate.

Conversely, here, the appellants failed to prove by clear and satisfactory evidence that Larry and Robert intended to create a resulting trust. Unlike *Malousek v. Meyer, supra*, Larry produced no evidence that having the land titled in Robert's name was beneficial to Larry. Rather, Larry testified that he and Robert decided they would put the farm in Robert's name "as [Robert] requested" and that they would "move forward from there." Larry later explained that Robert did not want to have to deal with Patricia in the event something happened to Larry. Furthermore, there is no clear and satisfactory evidence that Larry paid half of the downpayment. Robert contends that Larry did not pay any of the downpayment, and the ledger does not reflect any part of the downpayment being made by Larry. Larry testified in his deposition that he paid half of the downpayment, but he could not remember if it was paid by cash or check; however, at trial, he testified that he remembered producing cash.

Larry relies heavily upon the notations Robert made in his ledger to prove that each brother paid half of the funds necessary to buy the farm; however, equal contributions also support Robert's position that Larry agreed to loan him half of each year's deficit and the ledger was a method of keeping track of this amount. Keeping in mind that the intention of the resulting trust is to be found in the nature of the transaction, we find the nature of this transaction does not support a finding that a resulting trust was intended. See, e.g., *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021) (resulting trust found where decedent had boat titled in name of another for purposes beneficial to decedent and decedent continued to pay costs associated with boat); *Reetz v. Olson*, 146 Neb. 621, 20 N.W.2d 687 (1945) (resulting trust found in favor of person paying cost of school lease where lease was put in name of another because payor was ineligible to bid on lease).

Resulting trusts arise most frequently in situations in which one party pays the consideration for a purchase and title is taken in the name of another. *Reetz v. Olson, supra*. Here, however, there is no dispute that Robert paid consideration for the purchase of the land and title was taken in his name. The question is whether Larry's financial contributions were intended to be an investment or a loan. The burden was on Larry to produce clear and satisfactory evidence that a resulting trust was intended. Putting aside the conflicting testimony of Larry and Robert, our de novo review of the record does not provide clear and satisfactory evidence that the parties intended a resulting trust. The alleged reason for placing the property in Robert's name, Robert's management of the farm, Larry's failure to include his ownership interest as an asset on subsequent financial documentation, and Marla's testimony all cast doubt on whether Larry and Robert intended to create a resulting trust. Consequently, Larry failed to produce clear and satisfactory evidence that a resulting trust was created. The district court did not err in denying the appellants' claim, although we reach that determination on a basis other than relied upon by the district court. See *Doe v. Board of Regents*, 283 Neb. 303, 809 N.W.2d 263 (2012) (appellate court will affirm lower court's ruling that reaches correct result, albeit based on different reasoning).

*Patricia's Interrogatory Answers.*

The appellants assign that the district court erred when it disregarded Patricia's interrogatory answers without a basis to do so. The district court's order states, "Patricia . . . neither appeared at trial nor testified. Written discovery signed by Patricia was offered and received as Exhibit 11, but the Court has no ability to judge Patricia's credibility by these documents and gives them little to no weight."

The appellants argue that *State ex rel. Wagner v. Amwest Surety Ins. Co.*, 274 Neb. 121, 738 N.W.2d 813 (2007), supports their assertion that "[o]n de novo review, an appellate

court appraises the credibility of affidavit evidence in the light of other evidence but does not disregard it because it was not given as live testimony." Brief for appellants at 25. Our reading of *State ex rel. Wagner*, however, supports the district court's decision to give little to no weight to this evidence.

In *State ex rel. Wagner*, the court determined that the affidavit in question was not credible and was "simply too lacking in specificity and foundation" and untimely to contradict the other evidence. 274 Neb. at 130, 738 N.W.2d at 820. Although Patricia's interrogatory answers were not untimely, they do lack in specificity and foundation to weigh equally to the live, cross-examined testimony of Larry, Robert, and Marla. Patricia, a named party to the case, was not present at trial and did not testify. The answers to the interrogatories did not identify the foundation upon which Patricia's answers were made. And if, in fact, the purpose of omitting Larry's name on the deed was to preclude Patricia from having any interest in the land, we find it curious that she would have firsthand knowledge of the transaction. Furthermore, the discovery responses offered only self-serving affirmations of evidence already presented at trial by Larry; therefore, even if any error was committed, it was harmless. We find no merit in the appellants' assigned error.

*Remaining Assignments of Error and Cross-Appeal.*

The appellants assign that the district court erred when it dismissed their complaint. The assignment references and reiterates arguments addressed under the previous two sections. For the reason set forth above, we reject this argument.

The appellants assign that the district court erred in failing to award rents and profits to them. Based upon our determination that the appellants do not have an ownership interest in the farm, they are not entitled to its rents and profits.

[7] Based on our disposition of the above assignments of error, we need not address the error raised on cross-appeal.

An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Doty v. West Gate Bank*, 292 Neb. 787, 874 N.W.2d 839 (2016).

## CONCLUSION

The appellants failed to prove their claim for a resulting trust by clear and satisfactory evidence. We therefore affirm the district court's order, albeit for a different reason.

Affirmed.

Moore, Judge, participating on briefs.