IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BRANTNER V. SMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LARISSA M. JAMES AND ROBERT JAMES BRANTNER, TRUSTEES OF THE ROBERT JAY BRANTNER
LIVING TRUST, DATED MARCH 20, 2013, ET AL., APPELLANTS,

V.

SYLINDA SMITH, PERSONAL REPRESENTATIVE OF THE ESTATE OF CAROL SMITH, ET AL.,
APPELLEES.

Filed August 27, 2024.    No. A-23-464.

Appeal from the District Court for Sarpy County: NATHAN B. COX, Judge. Affirmed.

Steven G. Ranum, of Croker Huck Law Firm, for appellants.

Ryan P. Watson and John Andrew McWilliams, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellee Sylinda Smith.

MOORE and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Larissa Michelle James and Robert James Brantner (Rob) in their individual capacities, as well as in their capacities as trustees of the Robert Jay Brantner Living Trust (collectively the Appellants), appeal from the order of the district court for Sarpy County that determined ownership interests in certain residential property in Bellevue, Nebraska (the Nebraska property) and ordered partition of the property. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. THE PARTIES AND PROPERTY

This case involves a dispute between the families of Robert J. Brantner (Bob) and Carol Smith over title to the Nebraska property. Bob and Carol were the grantees (as joint tenants) on the warranty deed issued when the property was purchased in 2018. Also at issue is the effect of an agreement signed by Bob and Carol in 2019 on title to the Nebraska property.

Bob is the father of Larissa and Rob. Larissa and Rob live in California. Bob, who lived in California at the time the Nebraska property was purchased, was a trial attorney; the record does not otherwise specify what kind of law Bob practiced. Bob died on March 6, 2021, in California.

Carol, a friend of Bob's, is the mother of Sylinda Smith. Sylinda, her husband Daryl Isaacs, and their daughter Alyssa, as well as Carol and Bob, lived on the Nebraska property at certain points after its purchase. Carol died on June 10, 2021. Sylinda is the personal representative (PR) of Carol's estate.

The Nebraska property was purchased on November 30, 2018. Bob paid the purchase price for the property with funds he obtained from the sale of his interest in agricultural real estate in South Dakota (the South Dakota property). Carol was not an owner of the South Dakota property, and she did not contribute any funds to the purchase price of the Nebraska property. A warranty deed, executed on November 29 and filed on December 4 with the Sarpy County Register of Deeds, conveyed the property to "[Bob], a single person and [Carol], a single person, as joint tenants with right of survivorship, and not as tenants in common." In June 2019, Bob and Carol signed a document with respect to the Nebraska property, containing both ownership and rental provisions, which we have referred to as "the ownership agreement." We set forth the details of that agreement and other relevant documents in the trial evidence below.

Bob established the Robert J. Brantner Living Trust in 2013. Larissa and Rob are the trustees of that trust. Prior to his death, Bob transferred his interest in the Nebraska property to himself, Larissa, and Rob, and then further transferred his interest in the property to the trustees to hold in his trust.

### 2. PLEADINGS

The Appellants filed a complaint in the district court on March 19, 2021, and an amended complaint on March 30, naming as defendants Carol and anyone having an interest in the Nebraska property. They alleged that Bob had paid the entire purchase price for the property in 2018, that he was unable to obtain homeowner's insurance for the property if it was titled solely in his name because of the loss of his previous house by wildfire, and that Carol's name was added to the warranty deed for the Nebraska property as a joint tenant solely for the purpose of enabling Bob to acquire homeowner's insurance. They alleged Bob and Carol agreed that her interest was "in name only" and that she would execute and deliver a deed removing her name from the title and granting whatever interest in it she held back to Bob or his nominee upon Bob's request. The Appellants alleged that Carol and Bob also entered into a subsequent written agreement, providing that Bob was sole owner of the property, that Carol's name would be removed from the title once Bob could procure home insurance, and that Carol's true status with respect to the property was that of a tenant with monthly rent of $700. They alleged that to sever any joint tenancy in the

property, Bob subsequently transferred his interest in the property to himself, Larissa, and Rob, and further transferred his interest in the property to the trustees to hold in his trust. They further alleged that after various requests, Carol refused to transfer her interest in the property, that her tenancy terminated after she had failed to comply with a 7 day notice and she had not paid rent, and that she wrongfully remained in possession of the property. The Appellants asked the district court to determine whether Carol had any ownership interest in the property, setting forth causes of action/theories of recovery for breach of contract, quiet title, restitution, and alternative causes/theories for unjust enrichment and partition.

Carol counterclaimed for partition of the property. After Carol's death in June 2021, the action was revived and Sylinda, as PR of Carol's estate, and the "heirs and devisees of [Carol]" were substituted as defendants for Carol.

3. TRIAL

Trial was held before the district court on February 28, 2023. The court heard testimony from Larissa, Rob, and Sylinda and received various documentary exhibits into evidence.

Beginning in 2008, Carol rented a room from Bob in his house in Ventura, California. There was conflicting testimony about the nature of the relationship between Bob and Carol (whether it was simply a landlord and tenant relationship or a romantic one). However, it is clear that they resided on Bob's property in Ventura before that house burned down in a wildfire in approximately December 2017. After the fire, Bob rented another residence in Ventura. Carol lived in the rented house; Bob purchased a trailer and lived in the trailer on the rented property. Bob and Carol both resided in the house on the Nebraska property from approximately December 2019 until Bob was hospitalized in February 2021.

Because of the loss of his Ventura residence due to a wildfire, Bob was unable to acquire homeowner's insurance for the Nebraska property if that property was titled in his name alone. Accordingly, as noted above, the Nebraska property was titled to Bob and Carol as joint tenants with rights of survivorship, and not as tenants in common. There was conflicting testimony about Bob's intent in purchasing the Nebraska property. According to Larissa, Bob told her that he wanted his family to have "a place in the Midwest" so they could have similar experiences to his own experiences growing up in South Dakota. Bob also indicated that the purchase was due to tax implications from the sale of the South Dakota property. Larissa testified that Bob told her he wanted her and Rob to inherit the Nebraska property after his death and that he did not want Carol to have it. Rob's testimony on this issue was consistent with Larissa's. Sylinda testified that in phone conversations with Bob and Carol, they told her the Nebraska property was being purchased so that Carol could be closer to her family (Sylinda's daughter Alyssa was living in Bellevue at the time).

At some point, Sylinda had a federal conviction for a felony drug charge (possession with intent to deliver methamphetamine). She received a 5 year sentence and served 2 years, 8 months in facilities in Minnesota and then in Illinois, between approximately 2015 and 2018. She was then released on probation to a halfway house in Carter Lake, Iowa, where she stayed until June 2019. Daryl and Alyssa began renting the Nebraska property from Bob in December 2018. Sylinda testified that Daryl and Bob agreed that the money Daryl was paying for rent "would be put into an account for the taxes on the house." Sylinda began living full-time on the Nebraska property in

June 2019 (she spent time there on weekends while living in the halfway house). Larissa testified that Carol began living on the Nebraska property after signing the ownership agreement. According to Sylinda, Carol began living there "either the month or a couple of weeks before [Sylinda] was released from the halfway house."

The ownership agreement signed by Bob and Carol is dated June 27, 2019. The ownership portion of that agreement provides:

On November 30, 2018 [Bob] bought real estate property [at a specified address in Bellevue] located in Sarpy County, Nebraska.

[Bob] owns 100% of the title, deed and property at [the specified address].

At the time of [Bob's] death, 100% ownership of [the property] will transfer to his children, [Rob] & [Larissa].

[Bob] currently shares joint tenancy with [Carol] for the sole purpose of insuring the property, due to the fact that he was not able to purchase home owner's insurance under his own name. [Carol's] name will be removed from the title once he is able to purchase home owner's insurance under his own name.

(Bullet points omitted.) The rental portion of the agreement stated, "On a year to year basis, [Bob] will rent [the property] to [Carol] for $700 per month. The monthly rental rate will cover the total cost of annual property taxes & home owner's insurance associated with [the property]." Bob and Carol each signed on the lines above their typewritten names, where Bob was identified as "Owner" and Carol as "Tenant." The agreement was notarized by a California notary.

Larissa testified that she typed up the ownership agreement at Bob's direction and that it was not unusual for her to type documents for him since he did not have a laptop and printer after the fire. According to Larissa, the document was drafted because Bob wanted to avoid future conflict between the Brantner and Smith families. The parties agree that Bob and Carol were presented with the ownership agreement at a restaurant in Ventura on June 27, 2018, and that Bob, Carol, Rob, Larissa, Sylinda, and the notary who notarized the agreement were those present at the time. There was conflicting testimony, however, about what happened at the restaurant, other than the signing and the notarizing of the agreement.

According to Larissa, she and Rob drove from Los Angeles, California, to Ventura, picking up Bob, Carol, and Sylinda, at Bob's trailer before driving to the restaurant where the notary met them. She testified that food and drinks were not ordered and characterized the events at the restaurant as "very quick and calm" and "like a business meeting." She testified that Bob explained the purpose of the agreement, that neither Bob nor Carol objected to signing it, and that Sylinda encouraged Carol to sign it. She also testified that both Carol and Sylinda said they "didn't want to steal the house from [Bob's family]." Larissa testified that once the agreement was signed and notarized, she and Rob left, but she thought Bob, who walked them out to their vehicle, returned to the restaurant to have dinner with Carol and Sylinda. Rob's testimony was consistent with Larissa's.

Sylinda testified that her father died in California in June 2019 the same week she was released from the halfway house and that she and Carol went to California for his funeral. Sylinda indicated that she and Carol "went somewhere," that when they returned to Bob's trailer, Larissa was there, and that Larissa asked if they wanted to go have dinner with her, Rob, and Bob; an

invitation to which Sylinda and Carol agreed. She testified that there was no discussion before going to the restaurant that the purpose of the outing was for something other than dinner. According to Sylinda, Larissa returned to the trailer later with Rob, and they all went to a restaurant, at which time Larissa "brought up these papers" and "there was confusion and arguing." She testified that neither Bob nor Carol signed the ownership agreement immediately, and she stated that after Larissa presented the agreement, Bob walked out of the restaurant, followed by Carol, who went to talk to Bob, and then Larissa, and that a "heated discussion" ensued. She stated that she eventually went "outside to try to talk to [Carol]" as well, and observed Larissa "on her knees," trying to convince Carol to sign. Sylinda indicated that "it was getting late" by the time Bob, Carol, and Larissa reentered the restaurant, that although Bob and Carol eventually signed the agreement, her impression was that they did not want to do so. She agreed that the document was read to Carol at some point at the restaurant.

Bob began living in the house on the Nebraska property in approximately December 2019. According to Larissa, he came to Nebraska "to resolve a dispute with the Smith family," concerning "rent and payments and respect," and "to go protect his property and insert his ownership." Sylinda testified that Carol had been in California for her birthday and brought Bob back with her when she returned to Nebraska "to see the house and just to get away for a while because he was under a lot of stress regarding his [California property that burned]."

Larissa testified that Daryl, Sylinda, and Alyssa moved out of the Nebraska property in January 2020 at Bob's request. She stated that Bob said he wanted them to move out because "there was an issue with rent and that they were disrespecting him." Bob signed a handwritten letter regarding the Nebraska property, addressed to "Daryl Issacs [sic], & Family." The letter, which indicates it was "[h]and delivered," states, "All guest Priviledges [sic] as to my home are REVOKED by NOON JAN 31, 2020. You and your family will vacate by this date with only black bags of your clothing. There[]after, you and your family will be TRESPASSING ON my Pr[op]erty!"

Bob was hospitalized for about 2 weeks in February 2021, and Larissa and Rob came to Nebraska for the first time during that period. Bob returned to California with Larissa and Rob at some point in February before his death in March.

On February 9, 2021, Bob executed a quit claim deed, conveying his interest in the Nebraska property to himself (40%), Larissa (30%), and Rob (30%) as joint tenants. This quit claim deed was filed with the register of deeds on February 10, and we note several redactions (handwritten line crossing out certain information) that appear in the filed document. Both Bob's and Carol's names were typed in as grantors, but Carol's name is redacted. The typewritten consideration amount of "(no consideration)" is redacted and the handwritten amount of "$1" appears. Next to the signature lines at the bottom of the deed, Bob's, Carol's, Larissa's, and Rob's names were all printed in handwritten capital letters. Signatures appear next to Bob's, Larissa's, and Rob's printed names but not next to Carol's, which has been redacted. And, all four names were handwritten in the notary acknowledgement section as those appearing, but Carol's name has been redacted.

According to Larissa, there were "over a dozen" attempts made by Bob, her, or Rob to have Carol "execute a deed back to Bob or [her] family," but the only documentary evidence of such

efforts in the record (prior to the letters from the Appellants' attorney discussed below) is a typewritten letter from Bob to Carol, dated February 13, 2021, which stated:

> Please put your notarized signature on the enclosed Nebraska Quit Claim Deed transferring 100% ownership to me, [Bob] re: [the Nebraska property].
>
> This is 100% my house. I paid for this home with 100% of my money. I want 100% ownership.
>
> You agreed to temporarily put your name on the title to help me get home owners insurance.
>
> You told me that you would remove your name when I ask you to remove your name.
>
> I am now asking you to remove your name from the title.

Larissa testified that this letter was typed up by Rob at Bob's direction and was dictated to him by Bob.

While Bob was hospitalized, Rob filmed a video on his cell phone of Bob responding to certain questions asked by Rob. According to Rob, it was Bob's idea to make the video because Bob "was realizing any trust he had in Carol was no longer there" and he "felt he needed to clearly communicate things and make a record of his beliefs." In the video, Bob affirmed that when he signed the February 13, 2021, letter to Carol, he "read it and fully understood" and that Carol was his friend and not his girlfriend. According to Rob, Bob "was focused and knew exactly what he was doing and what was going on" when the video was made.

On March 5, 2021, the day before Bob's death, Larissa, as Bob's attorney-in-fact pursuant to his durable power of attorney, executed a deed conveying Bob's "entire interest in" the Nebraska property to the trustees to hold in his trust.

Carol did not pay any rent to Bob or the Appellants in March 2021. The Appellants' attorney sent Carol a letter dated March 11, referencing the agreement that Carol "would execute a deed to the [p]roperty back to [Bob] upon his request," referencing and enclosing a copy of the February 13 letter from Bob, and stating:

> Please consider this letter a final request for you to convey the [p]roperty based upon your earlier agreement. Enclosed is a deed for you to execute in front of a notary and return to me in the enclosed envelope by **Thursday, March 18, 2021 at 5:00 p.m.** If you return the executed deed, the Brantner family will work with you on a plan to allow you to find alternative living arrangements before the [p]roperty is sold.

The March 11 letter also directed Carol "to not dispose of or disturb" Bob's personal effects located on the property and informed her that if she failed to comply with the letter's terms, "the Brantner family will have no choice but to file a lawsuit against you." Subsequently, on March 19, (the same day the original complaint was filed), the Appellants' attorney sent Carol a 7-day notice to quit the property.

There was evidence about joint bank accounts maintained by Bob and Carol. Certain bank statements were received into evidence, and Sylinda testified she had obtained them from "the bank" as Carol's personal representative. Exhibit 37 includes bank statements (between December 2019 and March 2021) for a U.S. Bank account in Bob's and Carol's names, addressed to the

Nebraska property. A statement for September 2019 for that same account is in Carol's name only and addressed to the Nebraska property. Exhibit 38 includes bank statements for June 2019, and February 2020 to April 2020, for a Wells Fargo account in Bob's and Carol's names addressed to an address in Ventura. Exhibit 38 also includes a July 2021 statement for the Wells Fargo account addressed to Bob and Carol at the address of the Nebraska property. These two accounts were not Bob's only bank accounts.

There was also evidence about the homeowners' insurance policy maintained by Carol on the Nebraska property. Exhibit 34 is a Traveler's Insurance homeowner's policy for the Nebraska property for the policy period of September 10, 2019, to September 10, 2020 (the insurance agency is identified as "GEICO INS AGENCY INC.") It lists Carol as the named insured. The first page of exhibit 35, is a "Homeowners Policy Continuation Declarations," from Travelers, which again lists Carol as the named insured and "GEICO INS AGENCY INC" as the insurance agency, and is for the policy period of September 10, 2020, through September 10, 2021. Exhibit 35 also includes a GEICO car insurance policy for two vehicles, issued in July 2020, for coverage from August 26, 2020, through February 26, 2021, naming both Carol and Bob as insured parties. An account bill for the homeowner's policy is included in exhibit 35 and is addressed only to Carol. There is also a "Homeowners Policy Change Declarations" page, naming both Carol and Bob as insured parties. This page states that the change was effective September 10, 2020, and lists the reason for the change as "Change to Named Insured." A subsequent page lists both Carol and Bob as the named insureds. Exhibit 34 and exhibit 35 were found by Sylinda in Carol's "paperwork." Sylinda testified that she has not paid to insure the Nebraska property since becoming Carol's PR.

Aside from the policy name change referenced above, there is no testimony or documentary evidence in the record of Bob having purchased any homeowners' insurance policy for the Nebraska property in his name alone. Larissa was asked on cross-examination whether she brought with her "any evidence of an insurance policy that was purchased by Bob." She testified, "I think so. Is that in evidence? Am I allowed to ask my counsel?" At that point, the district court directed her to answer the question of whether she knew of any such document. Larissa responded, "I think there's a document because we're talking about the fact that he got homeowners insurance for the property that he purchased in Nebraska." Upon further questioning about whether she brought any evidence of such a homeowners' insurance policy with her to trial, she responded, "I think that is in the paperwork." Larissa confirmed that she had never personally acquired homeowner's insurance for the Nebraska property.

Larissa testified that her family has paid utilities and property taxes on the Nebraska property since Bob's death. She stated that neither Carol nor Sylinda ever contacted her asking to pay half of those expenses. Real estate tax receipts for the Nebraska property for the 2020 and 2021 tax years were admitted in evidence. The receipt for 2020 is addressed to "**BRANTNER/ROBERT J**" and Carol at the address of the Nebraska property and shows that it was paid by "BRANTNER/ROBERT J." The 2021 receipt is addressed to "**SMITH/CAROL**" and **"**ETALS [sic] TRUSTEES FOR ROBERT JAY" at an address in Los Angeles and shows that is was paid by "ROBERT BRANTNER." Another exhibit calculating real estate taxes for 2019, included a check drawn on Bob's checking account in Ventura. Larissa testified that Carol was not an owner of that checking account.

## 4. ORDER

On May 24, 2023, the district court entered an order on the parties' claims. The court found that the 2018 warranty deed showed that Bob and Carol had equal ownership in the Nebraska property as joint tenants with rights of survivorship and that each shared an undivided half interest in the property.

With respect to the subsequent ownership agreement, the district court stated that, in that document, "[Bob] asserts 100% ownership in the [p]roperty without any consideration of the fact that Carol had made the purchase possible and was paying the taxes and homeowner's insurance on the [p]roperty until her death." The court rejected "the interpretation that the joint tenancy deed was a farce," and it interpreted the ownership agreement to show that Bob and Carol "were joint tenants . . . until [Bob] was able to purchase insurance, at which time the intent of the parties was that Carol's interest in the [p]roperty would be terminated." It stated further, "To divest Carol of her contribution to the existence of the joint tenancy in the [p]roperty without [Bob] p[er]forming his part of the agreement, would result in an unequitable outcome." The court interpreted the ownership agreement to have a condition precedent that once Bob was able to purchase homeowner's insurance under his own name, the property would pass to him without payment of any money to Carol, and that Bob would then be sole owner of the property. The court found Carol, "by agreement," would be required to pay the homeowner's insurance and annual property taxes until such time as Bob was able to purchase homeowner's insurance. The court stated that "such a reading is, to the best of the [c]ourt's ability to determine, consistent with the true intent of the parties." The court also found that the lease portion of the written agreement was not sufficient to terminate the joint tenancy.

The district court concluded, however, that the joint tenancy was terminated when Bob filed the February 2021 quit claim deed conveying his interest to himself, Larissa, and Rob as joint tenants, thus converting the ownership into tenants in common, and leaving Carol with her half interest. The court found no evidence of breach of contract as alleged in the Appellants' first cause of action.

The district court found it appropriate to partition the property interests, awarding one-half interest to the Appellants (as joint tenants) and one-half to Carol's estate. A hearing was set for a later date on the appointment of a referee. The court denied the Appellants' remaining claims, and they subsequently perfected their appeal to this court.

## III. ASSIGNMENTS OF ERROR

The Appellants assert that the district court erred in determining that Carol's estate owned a 50 percent interest in the Nebraska property rather than quieting title solely in them. They assign additional errors, which are all arguments pertaining to their first assigned error. We have addressed each of those arguments below.

## IV. STANDARD OF REVIEW

Partition, quiet title, and constructive trust actions are actions in equity. *Dreesen Enters. v. Dreesen*, 308 Neb. 433, 954 N.W.2d 874 (2021). An action for specific performance sounds in equity. *Isham v. Jack*, 32 Neb. App. 647, 3 N.W.3d 656 (2024). Actions to declare a resulting trust are in equity. *Loeffler v. Loeffler*, 31 Neb. App. 93, 978 N.W.2d 57 (2022).

On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination. *Puncochar v. Rudolf*, 315 Neb. 650, 999 N.W.2d 127 (2024). However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024).

The construction of language in a deed is a question of law. *Walters v. Sporer*, 298 Neb. 536, 905 N.W.2d 70 (2017). The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below. *White v. White*, 316 Neb. 616, 6 N.W.3d 604 (2024). The interpretation of a contract and whether the contract is ambiguous are questions of law subject to independent review. *Brush & Co. v. W. O. Zangger & Son*, 314 Neb. 509, 991 N.W.2d 294 (2023).

## V. ANALYSIS

The Appellants assert that the district court erred in determining that Carol's estate owned a 50 percent interest in the Nebraska property rather than quieting title solely in them. They argue that the circumstances of the purchase of the property and the ownership agreement between Bob and Carol demonstrate that Carol was named on the deed only for purposes of acquiring homeowner's insurance, that she was never intended to be an owner, and that the court should have imposed a resulting trust or a constructive trust. Next, the Appellants argue that the court erred in interpreting the ownership agreement as imposing a condition precedent and that any condition precedent in the agreement was satisfied or waived. Next, they argue that the court could have considered the ownership agreement to be a quit claim deed from Carol to Bob and quieted title on that basis. They also present arguments about the court's findings with respect to Carol's payment of taxes and insurance on the property. Finally, they argue that the court erred in not quieting title in them and in ordering a partition to occur. We address each of their arguments in turn.

### 1. DEED

The November 2018 warranty deed unequivocally conveyed title to the Nebraska property to Bob and Carol as joint tenants with rights of survivorship. In ruling on the parties' claims, the district court first noted Neb. Rev. Stat. § 76-205 (Reissue 2018), which provides:

> In the construction of every instrument creating or conveying, or authorizing or requiring the creation or conveyance of any real estate, or interest therein, it shall be the duty of the courts of justice to carry into effect the true intent of the parties, so far as such intent can be collected from the whole instrument, and so far as such intent is consistent with the rules of law.

The district court stated:

[T]he [c]ourt cannot interpret [Bob] and Carol's intent such that it would violate the rules of law. [The Appellants] encourage the [c]ourt to read [the ownership agreement] in such a way that would make Carol's involvement in name only, and that she was placed upon

- 9 -

the deed as a farce to satisfy the homeowner's insurance requirement for [Bob] to purchase the [p]roperty. Such a reading would require the [c]ourt to render the warranty deed, which conveyed joint tenancy with rights of survivorship, and not as tenants in common, a nullity at best and potentially a violation of the Fraudulent Insurance Act as [Sylinda] argue[s]. In any event, such an interpretation is not allowed by the rules of law as indicated above.

The court went on to make certain findings about the ownership agreement, which it characterized as "an after-the-fact attempt by the parties to memorialize [Bob] and Carol's agreement regarding the purchase" of the Nebraska property and which the court read as "an agreement with a condition precedent." We address the court's findings about the ownership agreement further below.

The primary rule in construing a deed is to ascertain the intention of the parties from the deed itself, but when such intention is obscure or uncertain, courts may refer to subordinate rules of construction and permissible surrounding circumstances. *In re Estate of Everhart*, 18 Neb. App. 413, 783 N.W.2d 1 (2010). Where a deed is plain and unambiguous, its meaning is to be determined without reference to extrinsic facts. *Schaffert v. Hartman*, 203 Neb. 271, 278 N.W.2d 343 (1979), *disapproved on other grounds, Anderson v. Service Merchandise Co.*, 240 Neb. 873, 485 N.W.2d 170 (1992); *Badura v. Lyons*, 147 Neb. 442, 23 N.W.2d 678 (1946). The particular words of a conveyance are unimportant if the intention of the parties can be determined. *Chebatoris v. Moyer*, 276 Neb. 733, 757 N.W.2d 212 (2008). In construing instruments conveying property, equity concerns itself with the substance and not the form of the transaction, and the particular form or words of a conveyance are unimportant if the intention of the parties can be ascertained. *Id.*

The district court declined to interpret Bob and Carol's intent at the time the 2018 warranty deed conveyed title to them in such a way as to render the deed a nullity, and we cannot say that it erred in this regard. The deed itself contains no ambiguity or uncertainty in its terms. While Bob was apparently unable to obtain homeowner's insurance at the time the Nebraska property was purchased and the purchase price was paid entirely with the proceeds of the sale of Bob's interest in the South Dakota property, those facts do not render the deed a nullity. Because the intention to convey a joint tenancy to Bob and Carol is clear from the four corners of the 2018 warranty deed, we decline to examine other extrinsic evidence, including any oral agreement Bob and Carol may have had at that time. See *In re Estate of Everhart, supra*. See, also, *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015) (rule or doctrine of merger is that upon delivery and acceptance of unambiguous deed, all prior negotiations and agreements are deemed merged therein); *In re Claims Against Pierce Elevator*, 291 Neb. 798, 868 N.W.2d 781 (2015) (parol evidence rule renders ineffective proof of prior or contemporaneous oral agreement that alters, varies, or contradicts terms of written agreement).

While the Appellants assert that the ownership agreement should be considered to show the parties' intent with respect to the deed, the agreement was not entered into until nearly 7 months after the property was purchased and the deed was executed and filed. Further, the evidence about Bob's intent in purchasing the property was conflicting. Appellants' evidence generally suggests that Bob wanted the property to pass to his family and that it was purchased because of his fond memories of growing up in the Midwest (in addition to tax purposes). Sylinda presented evidence to suggest that the property was purchased so Carol could have a place to live close to some of her

family that then resided in Nebraska. We note that members of Carol's family (Sylinda's husband and daughter), rather than Bob or members of his family, were the first to occupy the property after its purchase. The record does not include a copy of any lease agreement with Sylinda's family for the property. As noted above, the language of the deed is unambiguous. We find no error in the court's determination that Carol took title as joint tenant with Bob by virtue of the 2018 deed.

### (a) Resulting Trust

A resulting trust is one raised by implication of law and presumed always to have been contemplated by the parties; the intention of the resulting trust is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance. *Loeffler v. Loeffler*, 31 Neb. App. 93, 978 N.W.2d 57 (2022). Where a transfer of property is made to one person and the purchase price or consideration is paid by another person, a resulting trust arises in favor of the person who made the payment or provided consideration. *Id.* A resulting trust will not be declared upon doubtful and uncertain grounds; and the burden is upon the one claiming the existence of the trust to establish the facts upon which it is based by clear and satisfactory evidence. *Id.* Where the alleged trust relationship is just as consistent with that of a gift or loan, courts will not ordinarily impress a resulting trust. *Id.*

The Appellants assert that the circumstances of the acquisition of the Nebraska property created a resulting trust, where Carol held legal title but had no equitable interest in the property. They argue that "the [o]wnership [a]greement alone was sufficient to quiet title" to them under the theory of a resulting trust and that "the content" of the ownership agreement "matched the reality of the arrangement." Brief for appellants at 16. The district court rejected their arguments in this regard, finding that both Bob and Carol brought consideration to the transaction that resulted in the November 2018 deed in that Bob paid the purchase price and Carol provided insurance so that the transaction could occur.

Upon our review of the evidence, we conclude that the Appellants did not meet their burden of showing a resulting trust. The Nebraska Supreme Court has observed that the rationale for a resulting trust is that individuals seldom give consideration to receive nothing. See *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021). Although Bob paid all of the purchase price for the property, he also received joint tenancy in the property. Carol facilitated the purchase of the property by obtaining the homeowners' insurance. There was no clear evidence to support finding a resulting trust was implicated at the time of the execution of the deed. After execution of the deed, members of Carol's family began renting the property soon thereafter, and Bob and Carol lived together on the property for a period of time before Bob became ill. The written ownership agreement, while perhaps supporting a resulting trust argument, was not entered into until 7 months after the purchase of the property and the evidence suggests that Bob and Carol were initially reluctant to sign the agreement. Under these circumstances, we cannot say that the district court erred in finding that the Appellants failed to sustain their burden by clear and satisfactory evidence that a resulting trust was formed by the circumstances of the property's acquisition.

### (b) Constructive Trust

The Appellants argue that a constructive trust could have been imposed under the circumstances of this case. The district court rejected their arguments in that regard.

A constructive trust is imposed when one has acquired legal title to property under such circumstances that he or she may not in good conscience retain the beneficial interest in the property. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). A constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the grounds that his or her acquisition or retention of the property would constitute unjust enrichment. *Id.* In determining whether to impose a constructive trust, the court will consider not only the original situation but also all events which have occurred since the defendant began to hold inequitably. *Id.* A party seeking the remedy of a constructive trust has the burden to establish the factual foundation, by evidence which is clear and convincing, required for a constructive trust. *Id.* The constructive trust doctrine is equitable in nature and should not be rigidly limited, and the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity. *Id.*

Generally, a court, sitting in equity, will not impose a constructive trust and constitute an individual as a trustee of the legal title for property unless it be shown, by clear and convincing evidence, that the individual, as a potential constructive trustee, had obtained title to property by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that, under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained. *Id.* A constructive trust is imposed to do equity and to prevent unjust enrichment. *Id.* Unjust enrichment is a flexible concept, occurring when a claim is based on the failure of consideration, fraud, or mistake and in other situations where it would be morally wrong for one party to enrich himself or herself at the expense of another. *Id.* Fraud comprises all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another. *Id.*

The district court found that the Appellants failed to show by clear and convincing evidence that Carol (or any defendant) obtained title to the Nebraska property by fraud, misrepresentation, or abuse of an influential or confidential relationship. The court stated that as far as it could determine from the evidence, "[Bob and Carol] entered into the land acquisition with eyes open and, if anything [Bob] having the upper hand, given his status as an attorney and presumably understanding the law." The court noted evidence that Bob and Carol had an intimate relationship at some point but found no evidence to show that Carol "exerted any abusive control to obtain ownership." The court observed that Bob's difficulties with obtaining insurance motivated him to enter into an agreement "that he could have resolved in his favor by simply obtaining insurance for the [p]roperty, which he never did."

In our own review, we see no evidence that Carol obtained title to the property as a joint tenant by fraud, misrepresentation, or abuse of an influential or confidential relationship. The transaction at the time the property was purchased appears very straight forward. Bob provided the purchase price; Carol provided the insurance; and her name was placed on the deed with Bob's, which allowed the purchase to take place. Although the record does not specify what kind of law Bob practiced as a trial attorney, he presumably had a basic understanding of property law. The evidence was conflicting as to the exact nature of Bob and Carol's relationship; at the least, she was a long-term friend. And, we see nothing in the record to suggest that she abused that

- 12 -

relationship to influence Bob to place her name on the deed together with his name. The district court did not err in declining to impose a constructive trust.

## 2. OWNERSHIP AGREEMENT

The Appellants assert that the district court erred in interpreting the ownership agreement and finding no breach of contract. They argue that the court should have found that Carol was contractually required to convey the Nebraska property back to Bob. They argue further that the court ignored provisions in the agreement stating that Bob was the sole owner and erred by imposing a condition precedent on Carol's obligation to transfer her interest.

### (a) Valid Contract

A party seeking to enforce a contract has the burden of establishing the existence of a valid, legally enforceable contract. *Valley Boys v. American Family Ins. Co.*, 306 Neb. 928, 947 N.W.2d 856 (2020). To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Slama v. Slama*, 313 Neb. 836, 987 N.W.2d 257 (2023). To be binding, an agreement must be definite and certain as to the terms and requirements upon its parties. *Equestrian Ridge v. Equestrian Ridge Estates II*, 308 Neb. 128, 953 N.W.2d 16 (2021). Generally, mutuality of obligation is an essential element of every enforceable contract and consists in the obligation on each party to do, or permit something to be done, in consideration of the act or promise of the other. *Valley Boys v. American Family Ins. Co., supra*.

The ownership agreement was dated June 27, 2019, and signed by both Bob and Carol. It provides that Bob purchased the Nebraska property on November 30, 2018, that he "owns 100% of the title, deed and property" at the location of the Nebraska property, and that on his death, "100% ownership" of the property will transfer to his children, Rob and Larissa. However, the agreement also provides that he "currently shares joint tenancy with Carol" for "the sole purpose of insuring the property" as he was not able to purchase homeowner's insurance in his own name. The agreement then provides that Carol's name "will be removed from the title once he is able to purchase home[]owner's insurance under his own name." The lease portion of the agreement provides that on "a year to year basis," Bob will rent the Nebraska property to Carol for $700 per month and that this rental rate will cover the annual cost of property taxes and homeowner's insurance associated with the property.

The terms of the ownership agreement are confusing at best, given that it provides that Bob owns 100% of the title, which will pass to his children on his death, but also provides that he currently shares joint tenancy with Carol, and that he is renting the property to her. It does not refer to any specific terms of the deed associated with the joint tenancy or provide a mechanism for reconciling any conflicts between any survivorship provisions of the deed and that term specified in the agreement, in the event Bob would die prior to being able to obtain insurance. We also note Sylinda's argument that the ownership agreement lacks terms indicating that Bob was doing something that he was not otherwise required to do or that Carol was receiving something that she was otherwise not entitled to receive. In other words, she argues that, as a joint tenant, Carol already had the right to occupy the property. Sylinda argues further that by occupying the property, Carol did not receive something she was not otherwise entitled to receive.

- 13 -

With respect to the lease portion of the agreement, Sylinda argues that Bob and Carol's joint tenancy interest and Bob's ongoing possession of the Nebraska property are not consistent with provisions of the Nebraska Uniform Residential Landlord Tenant Act. See Neb. Rev. Stat. § 76-1410 (7) (Cum. Supp. 2022) (defining "[l]andlord" as "the owner, lessor, or sublessor of the dwelling unit or the building of which it is a part"); § 76-1410(9) (defining "[o]wner" as "one or more persons, jointly or severally, in whom is vested (a) all or part of the legal title to property, or (b) all or part of the beneficial ownership and a right to present use and enjoyment of the premises"); and § 76-1410(17) (defining "[t]enant" as "a person entitled under a rental agreement to occupy a dwelling unit to the exclusion of others"). Sylinda argues Carol was both an owner with legal title and, as alleged by the Appellants, a tenant. We agree that the record does not show that Carol had occupancy of the property to the exclusion of others, given that Sylinda's family occupied the property (purportedly under another rental agreement) through January 2020 and Bob occupied the property from December 2019 until February 2021. We also note Rob's testimony that Carol was only renting a room and was not renting the entire Nebraska property, but his testimony is plainly inconsistent with the face of the lease portion of the ownership agreement, which purports to rent the entire property to Carol.

Although it is not entirely clear that the ownership agreement is a valid and enforceable contract, the district court did not reach this question, finding rather that a condition precedent in the ownership agreement had not been satisfied. We will assume, without deciding, that the contract was a valid contract and we now turn to an analysis of whether a condition precedent existed, and whether it was satisfied by the Appellants.

(b) Condition Precedent

The Appellants argue that the district court erroneously interpreted the ownership agreement to contain a condition precedent and in finding that the condition was not met.

The district court interpreted the ownership agreement as "an after-the-fact attempt by the parties to memorialize [Bob] and Carol's agreement" regarding the purchase of the Nebraska property. It read the ownership agreement to involve a condition precedent, specifically that Bob would provide the capital to purchase the property with Carol providing the insurability to allow the purchase. The court further interpreted the agreement to be that Bob and Carol would be joint tenants with rights of survivorship with the further agreement that once Bob was able to purchase insurance in his own name, the property "would pass to him without any payment of any monetary amount to Carol, but that [Bob] would be the sole owner" of the property.

The district court discussed Bob's February 2021 letter to Carol, which the court found "appear[ed] to acknowledge, at least in the mind of [Bob], that Carol continued to own an interest in the subject [p]roperty." The court observed that while Bob asked Carol in that letter to remove her name from the title, the letter did not demonstrate that "the condition precedent which would render this demand effective, i.e., the ability to purchase homeowner's insurance for the [p]roperty, was satisfied." The court found no evidence that Bob was ever able to purchase homeowner's insurance for the property.

A condition precedent is a condition that must be performed before the parties' agreement becomes a binding contract or a condition which must be fulfilled before a duty to perform an existing contract arises. *Dick v. Koski Prof. Group*, 307 Neb. 599, 950 N.W.2d 321 (2020),

*modified on denial of rehearing* 308 Neb. 257, 953 N.W.2d 257 (2021). A condition precedent is in contrast to a promise in a contract, the nonfulfillment of which is a breach, i.e., the failure to perform that which was required by a legal duty, and the remedy lies in an action for damages. *Id.* Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract. *Id.* Where contracting parties' intent is not clear, the language is generally interpreted as promissory rather than conditional. *Id.* The party seeking to enforce a contract containing a condition precedent bears the burden of proof as to the occurrence of the condition. *K & K Pharmacy v. Barta*, 222 Neb. 215, 382 N.W.2d 363 (1986).

The Appellants argue that the district court erred in implying a condition precedent to Carol's transfer of her 50% ownership interest in that Carol did not have a 50% ownership interest to transfer. Specifically, they argue that the ownership agreement does not support the idea that the insurance requirement was a condition precedent and that the language in the agreement about removing Carol's name from the deed "should just be interpreted as an indication of timing," an indication "of when Bob would ask Carol to execute a deed, not a condition that was to be satisfied before Carol was required to execute a deed." Brief for appellants at 21. They argue that "[f]rom Carol's perspective, it would not matter when her name was removed, as she held no interest in the [p]roperty." *Id.* This interpretation of the ownership agreement renders the 2018 warranty deed a nullity, an interpretation rejected by both the district court and this court.

Alternatively, the Appellants argue that if the agreement imposed a condition precedent, the condition was not the purchase of insurance, but rather, the ability to purchase insurance, and that condition was met. In support of this argument, they point to certain portions of Larissa's testimony, wherein she testified that Bob started asking Carol to remove her name from the deed in 2020 because "enough time had passed that he could be the sole name on the homeowners insurance." Larissa testified that "once that duration of time had passed, that's what their agreement was that she would remove her name so that he could be the sole owner of the property." She subsequently responded affirmatively when asked "did there come a point in time during Bob's life where you were able to obtain property insurance again." However, the only evidence of Bob's involvement in insuring the property was when his name was later added as an insured. There was no evidence that Bob ever obtained insurance on the property solely under his own name; the triggering event to remove Carol's name from the title.

The Appellants also argue that even if the condition precedent was not met, Bob had the ability to waive the condition, and he did so. They argue that to the extent Bob's ability to obtain homeowner's insurance was a condition precedent, it was a condition for Bob's benefit, i.e., the insurance existed to protect Bob's investment in the property for which he paid and for which he "was the 100% owner." Brief for appellants at 24. They argue that because Carol did not pay for the purchase of the property and did not have an ownership interest, she "would not have cared whether the [p]roperty was insured," and Bob waived the condition "unequivocally" through his multiple attempts to have Carol sign a deed. *Id.* The fact that the parties continued to insure the property throughout the time it was jointly owned negates this argument.

Again, the Appellants' arguments rely on their presumption that the 2018 warranty deed did not give Carol an ownership interest in the property. We have rejected this position based upon the clear, unambiguous terms of the deed. The district court did not err in its findings regarding the ownership agreement.

### (c) Quitclaim Deed

Next, the Appellants argue that the district court could have treated the ownership agreement as a quitclaim deed from Carol of any interest she had in the property to Bob and quieted title on that basis.

Neb. Rev. Stat. § 76-203 (Reissue 2018) defines a deed as "every instrument in writing by which any real estate or interest therein is created, aliened, mortgaged, or assigned or by which the title to any real estate may be affected in law or equity." Neb. Rev. Stat. § 76-211 (Reissue 2019) lists the minimal requirements for an instrument to qualify as a deed, including that it be signed by the grantor or grantors, and be acknowledged or proved and recorded. And, Neb. Rev. Stat. § 76-219 (Reissue 2018) provides that deeds executed outside of Nebraska may be acknowledged by a notary public.

The Nebraska Supreme Court has recognized that a conveyance of land may occur in a document that is not formally drafted as a deed. *Chebatoris v. Moyer*, 276 Neb. 733, 757 N.W.2d 212 (2008). It has acknowledged that "any writing may be effective as a legal conveyance if it names the grantor and grantee, contains words of grant, describes the land, and is delivered." *Id.*, 276 Neb. at 737, 757 N.W.2d at 216, citing *Matter of Estate of Severson*, 459 N.W.2d 473 (Iowa 1990). In *Chebatoris*, the trust document at issue stated that settlor "desires to create a trust and is concurrently herewith transferring certain properties to this trust which are set forth on [an attached appendix]." *Id.*, 276 Neb. 733 at 757 N.W.2d at 214. The Supreme Court recognized its duty to carry out the true intent of the parties, and it found that the trust document unambiguously stated the settlor's intent to transfer the property.

Sylinda draws our attention to an unpublished case, *Miller v. Miller*, No. A-08-247, 2008 WL 5064932 (Neb. App. Dec. 2, 2008) (selected for posting to court website). In that case, we found that the document at issue was not an enforceable contract, and we declined to find that the document, lacking language of conveyance and other formal requirements, qualified as a deed. We were unable to determine the parties' intent from the language of the document, which was unclear and suggested both that the grantee presently owned half of the real estate and was to receive half of it in the future. Additionally, the document did not specify when the grantee was to receive a one-half interest; did not indicate what was required of him, if anything, to acquire an interest; and, in short, the document left much open for future determination.

In the present case, we decline to read the ownership agreement as suggested by the Appellants. The agreement was acknowledged by a California notary. It was signed Bob, under the designation of "Owner," and Carol, under the designation of "Tenant." It is not clear whether this was intended to refer to her capacity as a tenant pursuant to the lease portion of the agreement or as an owner of her interest in the joint tenancy ownership shared with Bob. And, the agreement does not clearly express a present transfer of property. If the ownership agreement had operated as a quitclaim deed, there would have been no need for repeated attempts by Bob to get Carol to transfer her interest in the property to him. The Appellants' arguments with respect to the ownership agreement operating as a quitclaim deed fail.

### 3. FINDINGS ABOUT PAYMENT OF TAXES AND INSURANCE

The Appellants argue that the district court made incorrect findings of fact regarding Carol's payment of taxes and insurance being part of the ownership agreement between Bob and

Carol. They argue that the ownership agreement did not state Carol would pay taxes or insurance on the property and that the lease portion of the agreement provided she was to pay rent of $700 per month, an amount which would cover the total cost of annual property taxes and homeowner's insurance. Given our resolution of the Appellants' preceding arguments, we need not address the arguments presented in this section of their brief further. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *In re Estate of Walker*, 315 Neb. 510, 997 N.W.2d 595 (2023).

### 4. PARTITION OF PROPERTY

Given our resolution of the Appellants' preceding arguments, we find no error in the district court's ordering a partition of the property.

### VI. CONCLUSION

The district court did not err in determining that Carol's estate owned a 50 percent interest in the Nebraska property and ordering partition of the property to award one-half interest to the Appellants to hold as joint tenants and one-half interest to Carol's estate. Likewise, the court did not err in denying the Appellants' other claims. Accordingly, we affirm.

AFFIRMED.

WELCH, Judge, participating on briefs.

WELCH, Judge, dissenting.

I respectfully disagree with the majority in that I believe the record provides clear and satisfactory evidence that a resulting trust should have been imposed in favor of Bob. As our court recently held in *Loeffler v. Loeffler*, 31 Neb. App. 93, 102, 978 N.W.2d 57, 63-64 (2022):

A resulting trust is one raised by implication of law and presumed always to have been contemplated by the parties; the intention of the resulting trust is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance. *Malousek v. Meyer*, 309 Neb. 803, 962 N.W.2d 676 (2021). Where a transfer of property is made to one person and the purchase price or consideration was paid by another person, a resulting trust arises in favor of the person who made the payment or provided consideration. *Id.* The court will impose a resulting trust when the circumstances surrounding a conveyance make it clear that the parties intended such a result. *Id.* A resulting trust will not be declared upon doubtful and uncertain grounds; and the burden is upon the one claiming the existence of the trust to establish the facts upon which it is based by clear and satisfactory evidence. *Biggerstaff v. Ostrand*, 199 Neb. 808, 261 N.W.2d 750 (1978). Where the alleged trust relationship is just as consistent with that of a gift or loan, courts will not ordinarily impress a resulting trust. *Id.*

Here, the majority refers to the lack of ambiguity in the language of the deed that was issued in the names of Bob and Carol as being dispositive of the issue. But I read the law in this area as providing an exception to that rule when the property is transferred to an individual that did not provide consideration for the transfer notwithstanding the clarity of the deed. See *Klamp v. Klamp*, 51 Neb. 17, 70 N.W. 525 (1897) (resulting trust may be established by parole evidence). See, also, *Buckner v. McHugh*, 123 Neb. 396, 401, 243 N.W. 119, 122 (1932) (parole evidence to establish resulting trust must be clear, unequivocal, and convincing). When a transfer of property

is made to one person and the purchase price or consideration was paid by another person, the question becomes, what was the intent of the person providing consideration for the property in placing another person's name on the deed? These matters are considered when the purpose is not expressed in the deed or instrument of transfer, and most assuredly would not/will not result in the imposition of a resulting trust if the purpose of inclusion was consistent with that of a gift or a loan.

Here, the parties do not dispute that Bob provided consideration for the property notwithstanding the inclusion of Carol's name on the deed. Under these circumstances, the law requires the imposition of a resulting trust in favor of Bob if the circumstances make it clear that the parties intended such result. See *Klamp v. Klamp, supra* (determining intent of the parties requires considering all the circumstances together). In my view, what makes it clear here is the "ownership agreement" that Bob and Carol entered into approximately 7 months after creating the deed which agreement set forth their reasons for including Carol's name on the deed. The majority analyzes this agreement under contract principles, but I see its relevance here as a clear and unequivocal expression of intent as it relates to the question raised above. As I read that expression contained in the "ownership agreement," Bob and Carol stated unequivocally that Carol's name was placed on the deed only so Bob could obtain homeowner's insurance on the property; that Carol's only interest in the property was that of a tenant; that she was required to pay rent for that possessory right; that "[Bob] owns 100% of the title, deed and property at [the specified address]"; and that "[a]t the time of [Bob's] death, 100% ownership of [the property] will transfer to [Bob's] children [Rob] and [Larissa]." Bob and Carol both signed the "ownership agreement" containing this language and had it notarized. In my view, this is not a situation "where the alleged trust relationship is just as consistent with that of a gift or loan." I believe the expression contained in the notarized "ownership agreement" signed by both Bob and Carol clearly and satisfactorily demonstrates that Carol was placed on the deed "in name only" and that the law should impose a resulting trust in favor of Bob who paid the sole consideration for the transfer. I respectfully dissent.